## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 11** |
| **AMES HOLDING CORP., et al.,**[1] | ) |
| | ) **Case No. 09-14406 (CSS)** |
| | ) |
| **Debtors.** | ) **Jointly Administered** |
| | ) Bid Procedures Obj. Deadline: 1/5/10 at 4:00 p.m. (ET) |
| | ) Bid Procedures Hearing Date: 1/12/10 at 10:00 a.m. (ET) |
| | ) Sale Obj. Deadline (Proposed): 1/28/10 at 4:00 p.m. (ET) |
| | ) Sale Hearing Date: TBD |

### DEBTORS' MOTION FOR (A) ORDER APPROVING BIDDING PROCEDURES AND CERTAIN BID PROTECTIONS, SCHEDULING A SALE HEARING AND APPROVING THE FORM OF NOTICE OF AUCTION AND SALE HEARING AND (B) ORDER AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AT THE CONCLUSION OF SUCH AUCTION, THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND THE REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Ames Holding Corp. ("Ames Holding"), Axia Incorporated ("Axia"), TapeTech Tool Co., Inc. ("TapeTech"), and Ames Taping Tool Systems, Inc. ("Ames," and each a "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel, and pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), move this Court (the "Sale Motion") to grant the following relief:

(a) after a hearing (the "Procedures Hearing"), enter an order, substantially in the form attached to this Sale Motion as Exhibit A (the "Bidding Procedures Order"), (i) approving proposed bidding procedures in the form attached as Exhibit 1 to the Bidding Procedures Order

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Ames Holding Corp. (6130), Axia Incorporated (5251), TapeTech Tool Co., Inc. (7106), and Ames Taping Tool Systems, Inc. (6440). The Debtors' corporate offices are located at 3350 Breckinridge

(the "Bidding Procedures"), including, without limitation, certain bid protections, for a sale (the "Sale") of all or substantially all of the Debtors' assets (collectively, the "Assets"), for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assigned Contracts"), and for the rejection of those executory contracts and unexpired leases not designated as Assigned Contracts (collectively, the "Rejected Contracts"), as more fully described in the form of Asset Purchase Agreement attached to this Sale Motion as Exhibit B which the Debtors and Axia Acquisition Corporation, or its designee ("Stalking Horse Bidder"), intend to enter into in substantially such form, (ii) scheduling an auction (the "Auction") for the Assets and the Assigned Contracts, and (iii) approving the form and manner of notice of the Auction, including the form and manner of service of the notice (the "Sale Notice") attached as Exhibit 2 to the Bidding Procedures Order and the form and manner of Assumption and Assignment Notices attached as Exhibt 3 to the Bidding Procedures Order;

(b)     schedule a further hearing (the "Sale Hearing") to consider approval of the Sale; and

(c)     following the conclusion of the Sale Hearing, enter an order, substantially in the form attached to this Sale Motion as Exhibit C (the "Sale Orer"), approving the sale of the Assets and the assumption and assignment of the Assigned Contracts to Stalking Horse Bidder or such other party that is the successful bidder at the Auction, free and clear of all liens, claims and encumbrances, and the rejection of the Rejected Contracts.

In support of this Sale Motion, the Debtors respectfully show the Court as follows:

### Parties, Jurisdiction and Venue

1.     On December 14, 2009 (the "Petition Date"), the Debtors each filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committee has been appointed or designated.

2. A description of the Debtors' businesses, the reasons for filing these chapter 11 cases and the relief sought from this Court to allow for a smooth transition into operations under chapter 11 are set forth in the *Declaration of R. Andrew Garner in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 3] which has been filed with the Court.

3. The Court has jurisdiction to consider this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4. Venue is proper in this core proceeding pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A. Overview of the Debtors' Business

5. The Debtors are the leading designers, manufacturers, marketers and distributors of "automatic taping and finishing" ("ATF") tools used to increase productivity in interior drywall finishing. These ATF tools, invented by Ames beginning in 1939, enable interior finishing contractors to finish drywall joints substantially faster than less productive hand finishing methods.

6. Axia is a wholly-owned subsidiary of Ames Holding, and Ames and TapeTech are wholly-owned subsidiaries of Axia. Axia manufactures the ATF tools and then either sells or rents these tools to Ames and TapeTech. Axia also provides administrative services to Ames and TapeTech, including accounting services, information technology support, marketing, human resources, and customer service, for which Ames and TapeTech pay a specified fee per month.

1357992_5
RLF1 3517612v 1

TapeTech is engaged in the business of selling ATF tools wholesale through a network of independent tool dealers and distributors in the U.S. and internationally. These tools are purchased from Axia and sold under the brand name "TapeTech." Ames is engaged primarily in the business of renting ATF tools directly to interior finishing contractors to finish drywall joints prior to painting, wallpapering or other forms of final treatment. Ames offers these ATF tools through two avenues: (i) stores leased by Ames and (ii) franchises granted principally to drywall suppliers.

**B.      The Debtors' Pre-Petition Credit Facility**

7.      Prior to the Petition Date, pursuant to the terms and conditions set forth in that certain Amended and Restated Credit Agreement dated as of April 1, 2008 (as at any time amended, restated or modified, the "Credit Agreement"), among Axia (as the borrower), UBS AG, Stamford Branch (as the issuing bank, administrative agent, senior collateral agent and subordinated collateral agent, "Collateral Agents"), UBS Loan Finance LLC (as the swingline lender), and the other parties thereto as lenders (collectively, the "Lenders"), the Lenders agreed to extend certain terms loans (in the form of senior term loans, the "Senior Term Loans," and in the form of subordinated term loans, the "Subordinated Term Loans") and a revolving line of credit to Axia in the maximum principal amount of $10,000,000.

8.      Ames Holding, TapeTech and Ames, jointly and severally, guaranteed payment of the indebtedness at any time owing by Axia under the Credit Agreement.

9.      To secure their indebtedness under the Credit Agreement and the guaranties, and pursuant to that certain Amended and Restated Security Agreement dated as of April 1, 2008 (as at any time amended, restated or modified, the "Security Agreement") and other documents executed in connection therewith, the Debtors granted to the Collateral Agents, for the benefit of

4

the Lenders, security interests in and liens upon essentially all of the Debtors' real and personal property of every kind and nature (the "Collateral").

10. As of the Petition Date, the principal balance of the Senior Term Loans totaled approximately $69,200,000, and the principal balance of the Subordinated Term Loans totaled approximately $91,800,000.

## C. Events Leading to the Proposed Sale and Bankruptcy Filings

11. The financial viability of the Debtors was severely impacted by the dramatic decline in commercial and residential construction in the United States, particularly as a result of declines in construction in late 2007. By late 2007, a widespread and dramatic downturn in the commercial and residential markets in the United States was occurring. Commercial and residential construction levels plummeted as a result. This downturn was followed by a severe crisis in United States and global credit markets. This precipitous fall in the commercial and residential construction in the United States led to a significant decrease in the demand for and use of ATF tools and other products sold and rented by the Debtors and, therefore, materially and adversely impacted the Debtors' revenue streams.

12. Over the last few years, the Debtors' revenues have fallen precipitously--an average of sixteen percent (16%) per year for the last several years and overall by sixty-five percent (65%). Revenues in 2006 were approximately $99,000,000, compared to approximately $80,000,000 in 2007, approximately $56,000,000 in 2008, and finally $34,000,000 forecasted for 2099. Over the same four-year time period, operating profits (EBITDA) declined an average of thirty-two percent (32%) per year and one hundred twenty-seven percent (127%) in the aggregate.

5

13.     In June, 2009, the Debtors retained Alvarez & Marsal North America, LLC ("A&M") to evaluate the Debtors' business plan, operations and cash flow forecasts. Based on this evaluation, A&M determined that:

(a)     The Debtors currently are losing money. Through the six month period ending June 30, 2009, the Debtors generated an EBITDA loss of approximately $4,300,000 on revenues of approximately $19,100,000, or approximately $167,000 per week. For 2009, A&M forecasts that the Debtors will generate an EBITDA loss of approximately $8,654,000 on revenues of approximately $34,000,000;

(b)     For 2010, the Debtors are expected to generate an EBITDA loss of approximately $4,824,000 on revenues of approximately $29,500,000 and are not expected to become EBITDA positive until 2013; and

(c)     Based on projections, the Debtors will require approximately $24,157,000 of additional liquidity, beyond the cash and liquidity and interest reserves, before the Debtors return to a positive, self-sustaining cash flow.

14.     Faced with such substantially diminished revenues from sales and rentals of the ATF tools throughout the Debtors' regional markets, the Debtors were unable to generate the funds necessary to cover operating and maintenance costs, including amounts needed to service their secured indebtedness.

15.     Confronted by this rapid and dramatic decline in commercial and residential construction, the significantly reduced demand for the Debtors' products, and falling revenues, the Debtors pursued a number of actions to reduce fixed costs, beginning in late 2007, including the following:

(a)     Reduced personnel, including implementing minimum staffing levels at many stores and service centers, resulting in the cutback from 334 employees in December 31, 2007 to 236 employees as of September 11, 2009;

(b)     Reduced rent in the aggregate amount of $286,000 annually as a result of rent concessions obtained by Ames and Ames Holding from their landlords in 2008 and 2009;

(c)     Closed Ames locations in 2008 and 2009, reducing the number of operating stores from 125 stores as of December 31, 2007 to 97 stores as of September 30, 2009;

6

(d)     Reduced wages by 10%, effective August 1, 2009; and

(e)     Reduced marketing, freight, security services and other administrative costs.

16.     As a result of the Debtors' efforts, fixed costs have been reduced by approximately fifteen percent (15%) since early 2008. The high fixed cost structure of the Debtors' businesses, however, limits the amount of significant cost-cutting opportunities still available. For example, over fifty percent (50%) of the Debtors' fixed costs stem from store locations leased by Ames, where very little additional reductions are possible. Given the previous reductions in employees, any further reductions related to these stores would necessitate additional store closings and, in turn, would have a negative impact on revenue and Ames' ability to maintain its market presence.

17.     Having reduced fixed costs to the lowest practicable level, but still struggling to deal with the mounting problems caused by such adverse market conditions, the Debtors explored alternative sources of working capital, such as additional financing and new investors. With the financial markets in crisis as the United States economy slid into a recession, and given their current financial condition, the Debtors concluded that there was no likelihood of obtaining new financing or attracting additional investors.

18.     Confronted with the reality that the value of their assets may diminish significantly in just a short period of time, the Debtors determined that the only way to preserve the value of these assets was to, without delay, commence these bankruptcy cases and sell these assets pursuant to section 363 of the Bankruptcy Code.

19.     With this strategy in mind, and given their extremely high debt load, the Debtors entered into discussions with the Lenders regarding the Debtors' alternatives to reorganize their affairs and to preserve the value of their business operations.

7

20. The Debtors' discussions with the Lenders culminated in the negotiation and execution of that certain Restructuring Agreement dated as of December 4, 2009 (the "Restructuring Agreement"), among the Debtors and the other parties thereto (collectively, the "Signing Lenders"), pursuant to which the Debtors and the Signing Lenders agreed upon a process for preserving the value of the Debtors' assets through these chapter 11 bankruptcy filings and an expeditious section 363 sale.

21. In accordance with the Restructuring Agreement, but subject to Court approval, the Debtors and Stalking Horse Bidder intend to enter into an asset purchase agreement in substantially the form of the Stalking Horse Agreement. Stalking Horse Bidder is a Delaware corporation newly formed for the purpose of acquiring the Assets, assuming certain liabilities of the Debtors, and taking assignment of the Assigned Contracts and is a wholly-owned subsidiary of another newly formed corporation the shareholders of which include the Equity Investors under (and as defined in) the Restructuring Agreement, each of whom is either a Lender or a shareholder of Ames Holding.

22. The Debtors believe that the proposed transaction with Stalking Horse Bidder, pursuant to the procedures and on the timeline set forth in this Motion, represents the best and likely only opportunity available to the Debtors to preserve the going concern value of their assets. The Sale will generate value above the liquidation value of the Assets and allow for the continuation of the Debtors' business as a going concern, thereby allowing employees to remain employed and for a significant number of the Debtors' leases and executory contracts to be assumed and assigned. If the proposed transaction is approved and consummated, the Stalking Horse Bidder will operate the Debtor's assets with the added benefit of new revolving and term financing and new equity contributions.

8

23. If their strategy for preserving the value of their assets is to succeed, the Debtors' believe that the proposed Sale must occur within an extremely short period of time. Key to the success of the Sale is the survival of the Debtors' supplier and customer base, as well as the preservation of ongoing consumer and employee goodwill and support. The Debtors' businesses cannot survive a prolonged period of uncertainty. Suppliers will turn to other outlets for their products, customers will look elsewhere for the products they have been purchasing from the Debtors, and key employees will leave for other opportunities. To preserve this going concern value and obtain the anticipated benefits of the proposed Sale, then, it is imperative that this process be completed expeditiously. Given the continuing stress on the Debtors' businesses, key relationships with the Debtors' customers and suppliers likely cannot be preserved if the sale process is not concluded quickly. Absent a prompt sale, the value of the Debtors' assets will rapidly decline, and the ability to achieve a going concern sale will be lost.

24. Unless the proposed transaction is consummated expeditiously, the Debtors may have no choice but to commence an immediate liquidation of their assets. Such a liquidation, even if conducted in an orderly manner, will result in a substantial loss of value in the Debtors' assets, plus a loss of jobs for the Debtors' employees.

25. To establish a process for soliciting competing offers for the Assets, and to attempt to maximize the value of their assets, the Debtors seek Court approval of certain bidding procedures.

26. To assist in this process, prior to the Petition Date, the Debtors retained an investment banking firm, Barrier Advisors, Inc. ("Barrier Advisors"), to aid the Debtors in soliciting offers to purchase all or substantially all of the Debtors' assets from other interested parties. By separate motion, the Debtors seek Court approval for Barrier Advisors to serve as the

9

Debtors' investment banker during these bankruptcy cases. To market the Debtors' assets, Barrier Advisors is preparing materials describing the Debtors, their businesses and their assets and identifying persons who might have the interest and ability to bid on the Debtors' assets. With this target list in hand, Barrier Advisors will distribute the solicitation materials to these potentially interested parties, assist the Debtors in providing interested parties with any information requested regarding the Debtors, their businesses and their assets, and solicit competing bids.

27.    To further facilitate this marketing effort, the Debtors, with the assistance of Barrier Advisors, are creating a data room in which the Debtors will be able to store a substantial amount of information regarding their businesses and assets. Access to this data room will be password protected, so that only those interested parties with the Debtors' consent can access the data room.

28.    Under these exigent circumstances, then, the Debtors believe that the proposed transaction, as reflected in the Stalking Horse Agreement, is fair and appropriate, in the best interest of their respective estates, creditors, employees, and other parties in interest, and will achieve the ultimate goals of the chapter 11 reorganization process - - maximizing the value available by preserving the Debtors' businesses as going concerns. To that end, the Debtors seek the Court's approval of the proposed Sale and related bidding procedures to enable the Debtors to solicit competing offers for substantially all of their assets to ensure maximum recovery on these assets.

1357992_5
RLF1 3517612v 1

## Summary of the Stalking Horse Agreement[2]

29.    The pertinent terms of the Stalking Horse Agreement are as follows:

- Purchased Assets. Section 2.1(a) of the Stalking Horse Agreement lists the Purchased Assets and states that Stalking Horse Bidder shall acquire, free and clear of all Liens (except for Permitted Encumbrances), all of the tangible and intangible assets, real property and personal property of the Debtors and may designate the contracts of the Debtors to become Assigned Contracts, but in all events omitting the Excluded Assets (as discussed below). The Purchased Assets shall include, without limitation, the following items of property: (i) the Owned Real Property and the Leased Real Property that is the subject of an Assigned Contract; (ii) all tangible personal property related to, or used or useful in or held for use in the conduct of the Business, including equipment, machinery, furniture and fixtures; (iii) the Inventory; (iv) all cash and cash equivalents, securities (other than any equity interest in the Debtors) and negotiable instruments of the Debtors (other than Excluded Cash);    (v) the Receivables; (vi) certain books and records; (vii) all goodwill associated with the Business or the Purchased Assets; (viii) the Transferred Intellectual Property; (ix) all the rights and benefits accruing under any Assigned Contracts; (x) all the rights and business accruing under any franchise agreements; (xi) any rights, claims, defenses, counterclaims, cross-claims or causes of action of the Debtors whether arising out of events accruing prior to or on or after the Closing Date, except for commercial tort claims and Avoidance Claims; and; (xii) any rights to tax refunds, credits or similar benefits.

- Excluded Assets. Section 2.1(b) of the Stalking Horse Agreement lists the Excluded Assets, which include, without limitation, (i) the organizational documents of the Debtors; (ii) executory contracts and unexpired leases that are not Assigned Contracts; (iii) any assets relating to the Employee Plans; (iv) any of the capital stock or equity interests in any of the Debtors; (v) commercial tort claims and Avoidance Claims; and (vi) cash in the amount necessary to fund in full the Carve-Out under the Cash Collateral Order.

- Assumed Liabilities. Stalking Horse Bidder shall assume the liabilities and obligations set forth in Section 2.2(a) of the Stalking Horse Agreement, which includes, without limitation, (i) all liabilities of the Debtors under the Assigned Contracts; (ii) all liabilities in respect of Permits and Licenses arising and relating solely to the period from and

---

[2] This summary of the Stalking Horse Agreement is for descriptive purposes only. To the extent that there are any discrepancies between this summary and the Stalking Horse Agreement, the Stalking Horse Agreement shall control. All capitalized terms used in this summary, unless otherwise defined in this Sale Motion, shall have the meanings ascribed to such terms in the Stalking Horse Agreement.

after the Closing; (iii) all Property Taxes and assessments on the Purchased Assets that relate to the period after the Closing Date; and (iv) all Designated Trade Payables.

- Excluded Liabilities. Section 2.2(b) of the Stalking Horse Agreement sets forth the liabilities and obligations which are not being assumed by Stalking Horse Bidder, which include, without limitation, (i) all Excluded Taxes; (ii) any liabilities relating to or arising out of any of the Excluded Assets; (iii) all accounts payable, except for the Designated Trade Payables; (iv) any environmental liabilities relating to the Owned Real Property, the Leased Real Property that exist on or prior to the Closing Date; (v) any liabilities arising as a result of a lawsuit initiated at any time on or prior to the Closing Date; (vi) all liabilities arising from or related to the Employee Plans or to the termination of any such plans, including withdrawal or termination liabilities; and (vii) all liabilities and obligations arising under the Credit Agreement.

- Purchase Price. Section 2.4 of the Stalking Horse Agreement provides that, in consideration for the transfer of the Purchased Assets to Stalking Horse Bidder and the other undertakings set forth in the Agreement, the Purchase Price shall consist of the following: (i) $9,000,000, payable in the form of a term note issued ratably to the Existing Senior Term Lenders ("Term Note A"); (ii) $9,000,000, payable in the form of a term note issued ratably to the Existing Senior Term Lenders ("Term Note B"); (iii) equity issuable to the holders of Term Note B in an amount equal to 21.5% of the equity of Parent; (iv) the assumption at the Closing by Stalking Horse Bidder of the Assumed Liabilities; and (v) an amount equal to the Determined Cure Costs payable by Stalking Horse Bidder under Section 5.1(c) of the Stalking Horse Agreement.

- Releases. Section 2.8(m) of the Stalking Horse Agreement specifies that, at the Closing, the Debtors will deliver to Stalking Horse Bidder releases of Stalking Horse Bidder, Aurora Equity Partners III, L.P., each of the agents and lenders that is or was a party to the Credit Agreement, each other equity owner of Stalking Horse Bidder, and each of their respective affiliates, officers, directors, representatives, agents, counsel, consultants, successors and assigns, in each case with respect to any claim or cause of action other than commercial tort claims or Avoidance Claims. Section 5.16 of the Stalking Horse Agreement further provides that, at any time and from time to time, prior to the date that is 90 days after the Closing Date, Stalking Horse Bidder may designate for the release and waiver by the Debtors of any Avoidance Claims against (i) lenders to the Debtors, (ii) customers of the Debtors, (iii) vendors of the Debtors relating to the Purchased Assets or the Business, (iv) suppliers of the Debtors relating to the Purchased Assets or the Business, and (v) Transferred Employees. Section 5.16 further states that, subject to the approval of the Bankruptcy

12

Court, the Debtor will waive and release any such Avoidance Claims so designated by Stalking Horse Bidder.

- Closing. Section 2.7 of the Stalking Horse Agreement requires that the Closing occur on the third business day following the satisfaction or waiver of the conditions to the obligations of the parties set forth in Sections 7.1 and 7.2, or on such other date as the Debtors and Stalking Horse Bidder may agree upon.

- Post-Closing Access to Records. The Purchased Assets include all of the books and records of the Debtors relating to the Purchased Assets and the Business. See Section 2.1(b)(i) of the Stalking Horse Agreement. Pursuant to Section 5.14 of the Stalking Horse Agreement, in the event that the Debtors need access to these books and records after the Closing for the purposes of preparing income tax returns, complying with any audit request, subpoena or other investigative demand by any Governmental Authority, or for any civil litigation or any other legitimate purpose not injurious to such other party, Stalking Horse Bidder is obligated to allow the Debtors and their authorized representatives and agents reasonable access to such records during normal business hours at Stalking Horse Bidder's place of business for the sole purpose of obtaining information for these uses and is obligated to allow the Debtors to make extracts and copies of these books and records as may be necessary or convenient.

- Successor Liability. Paragraph 11 of the proposed Sale Order provides that Stalking Horse Bidder shall not be liable in any way (as a successor entity or otherwise) for any claims against the Debtors, other than Assumed Liabilities. Paragraph 14 of the proposed Sale Order further provides that, except for the Assumed Liabilities, Stalking Horse Bidder shall not acquire or assume, and shall have no liability or obligation for, any liabilities of the Debtors as a successor in interest or successor-in-title.

- Termination Rights. Section 8.1 of the Stalking Horse Agreement addresses the circumstances under which the Agreement may be terminated.

- Break-Up Fee and Expense Reimbursement. Section 9.1 of the Stalking Horse Agreement sets forth the basis on which Stalking Horse Bidder is entitled to recover a break-up fee and expense reimbursement: if Stalking Horse Bidder terminates the Stalking Horse Agreement pursuant to Sections 8.1(e), 8.1(g) or 8.1(i), the Debtors shall be obligated to pay to Stalking Horse Bidder, within two business days after such termination, a fee equal to $500,000 (the "Break-Up Fee") in cash, in addition to the reimbursement of Stalking Horse Bidder's reasonable, actual out-of-pocket fees and expenses, including reasonable attorneys' fees and expenses of other consultants, incurred in connection with the transaction

1357992_5
RLF1 3517612v 1

contemplated by the Stalking Horse Agreement, including the expenses of the proposed lenders under the New Senior Credit Facility (the "Expense Reimbursement"); provided that if the Stalking Horse Agreement is terminated pursuant to Section 8.1(e) due to the exercise by the Board of Directors of any of the Debtors of their fiduciary duties in accepting any other offer or taking any action in contravention of the Stalking Horse Agreement, as contemplated by Section 3(d) of the Restructuring Agreement, then (x) the Expense Reimbursement shall be due and payable within two business days after such termination and (y) the Break-Up Fee shall only become due and payable upon the consummation of an Alternative Transaction. The Break-Up Fee and/or the Expense Reimbursement shall constitute a superpriority administrative expense of the Debtors under section 507(b) of the Bankruptcy Code.

- Conditions to Closing. Section 7.1 of the Stalking Horse Agreement sets forth the conditions ("Closing Conditions") which must be fulfilled in order for Stalking Horse Bidder to be obligated to consummate the sale as contemplated by Stalking Horse Agreement. These Closing Conditions include that the Court shall have entered an Order approving the sale that is acceptable in form and substance to Stalking Horse Bidder.

## Relief Requested

30. By this Sale Motion, the Debtors request entry of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A:

(a) approving the Debtors' proposed Bidding Procedures for marketing the Assets, which procedures are attached as Exhibit 1 to the Bidding Procedures Order; (ii) Sale Notice in the form attached as Exhibit 2 to the Bidding Procedures Order; and (iii) the Assumption and Assignment Notice in the form attached as Exhibit 3 to the Bidding Procedures Order;

(b) approving the form and manner of notice of the Auction;

(c) approving the Bid Protections;

(d) establishing January 27, 2010 at 5:00 p.m. (prevailing Eastern Time) as the deadline for the submission of bids (the "Bid Deadline");

(e) scheduling the Auction, if necessary, on January 29, 2010;

(f) scheduling the Sale Hearing on February 4, 2010, or at such other time as the parties may be heard, at which the Court will consider whether to:

14

(i)      approve either (1) the Stalking Horse Agreement, or (2) such other agreements between the Debtors and the successful bidder(s) at the Auction;

(ii)     authorize the Sale of the Assets free and clear of all liens, claims and encumbrances to Stalking Horse Bidder or such other successful bidder(s) at the Auction;

(iii)    authorize the assumption and assignment of certain executory contracts and unexpired leases to be assumed and assigned in connection with the Sale; and

(iv)    authorize the rejection of certain executory contracts and unexpired leases to be rejected in connection with the Sale;

(g)     granting the relief set forth in subparagraph (f) above; and

(h)     granting such other and further relief as the Court deems necessary or appropriate

## The Proposed Bid Procedures

31.    The Debtors are requesting that the Court approve the Bidding Procedures for the sale of the Assets with a Sale Hearing to occur on or about February 4, 2010.[3] The following is a summary, pursuant to Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), of the proposed Bid Procedures. All capitalized terms used in this summary, unless otherwise defined in this Motion, shall have the meanings ascribed to such terms in the Bidding Procedures.

32.    Bidding Process. These Bidding Procedures specify the manner in which bidders and bids become Qualified Bidders and Qualified Bids (as defined below), the receipt, evaluation and negotiation of bids received, the conduct of any Auction, the ultimate selection of the Successful Bidder(s) and Back-up Bidder (as defined below), and Court approval (the "Bidding

---

[3] The proposed form of Bidding Procedures Order contains the Debtors' proposed dates, which are subject to the availability of the Court and may change.

1357992_5
RLF1 3517612v 1

Process"). Any party who wishes to participate in the Bidding Process must submit a bid in accordance with the Bidding Procedures.

33. Participation Requirements. **To participate in the Bidding Process, each prospective bidder must execute a confidentiality agreement in substantially the same form executed by each other prospective bidder (a "Confidentiality Agreement"). Upon execution and delivery of a Confidentiality Agreement, the Debtors may, in their discretion, provide information to any such prospective bidder, schedule management presentations, and make management otherwise available to selected bidders. If the Debtors furnish any information related to the Purchased Assets not already provided to Stalking Horse Bidder, then the Debtors shall make such information available to Stalking Horse Bidder and each other Qualified Bidder.** See Local Rule 6004-1(c)(i)(A).

34. Bid Deadline. **To become a Qualified Bidder, a bidder must deliver the Qualified Bid Required Documents (as defined below) so as to be received by no later than 5:00 p.m. (prevailing Eastern Time) on January 27, 2010 (the "Bid Deadline"). Subject to the terms of the Stalking Horse Agreement, the Bid Deadline may be extended by the Debtors at any time and from time to time; provided that, if the Bid Deadline is extended, the Debtors will promptly notify each bidder that already has submitted a Qualified Bid.** See Local Rule 6004-1(c)(i)(B).

35. Bid Requirements. **For a bid to become a Qualified Bid, each bid must include all of the following (the "Qualified Bid Required Documents"): (a) a letter, executed by such bidder, (i) setting forth the cash purchase price, which cash amount must reflect a value to be delivered to the Debtors at closing equal to or greater than the sum of (A) $21,138,686 plus (B) cash in an amount equal to the sum of (I) the Break-Up Fee in an**

16

amount equal to $500,000, plus (C) the Expense Reimbursement, plus (II) $250,000, and (ii) stating the assumed liabilities proposed to be paid or assumed by such bidder for the Purchased Assets, the value of which must be equal to or greater than the value of the Assumed Liabilities, (iii) stating, among other requirements, that the bid submitted by such bidder is irrevocable until the conclusion of the Sale Hearing, (iv) including a commitment to close on or before February 26, 2010 (the "Projected Closing Date"), and (vi) confirming that the bid submitted by such bidder is not conditioned on receipt of financing or the outcome of any due diligence investigation regarding the Purchased Assets other than as may be included in the Stalking Horse Agreement; (b) a Modified Purchase Agreement and a marked Modified Purchase Agreement reflecting the variations from the Stalking Horse Agreement; (c) (i) to the extent that the bidder proposes to pay for the Purchased Assets in whole or in part, from cash on hand, recent financial information, reasonably satisfactory to the Debtors, showing the ability to pay the cash portion of the purchase price under the Modified Purchase Agreement, (ii) to the extent that such bidder is proposing to pay for the Purchased Assets with funds from any third-party financing source (whether such source is providing debt or equity financing), copies of written and legally binding firm commitments to provide such financing (including, without limitation, under any existing credit facility) executed by all parties thereto, in each case, containing no material conditions to the closing and funding of such financing other than satisfaction of the conditions set forth in the Modified Purchase Agreement in all material respects and other than entry of the Sale Order and receipt of required government consents or approvals; and (d) a cash deposit in the amount of $1,000,000. See Local Rule 6004-1(b)(iv)(F). No Qualified Bid Required Documents shall, or shall purport to, request or entitle the bidder

1357992_5
RLF1 3517612v 1

to any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment. See Local Rule 6004-1(c)(i)(B).

36.   Determination of "Qualified Bidder" Status. Subject to other bids being deemed Qualified Bids in accordance with the Bidding Procedures, any bid meeting the requirements specified in the Bidding Procedures shall constitute a "Qualified Bid" and the bidder submitting such Qualified Bid referred to herein as a "Qualified Bidder." For all purposes of the Bidding Process, Stalking Horse Bidder shall be deemed a Qualified Bidder, and the transaction proposed in the Stalking Horse Agreement shall be deemed a Qualified Bid. The Debtors, in consultation with the Creditors' Committee, shall make a determination regarding whether a bid is a Qualified Bid and, within 24 hours following the Bid Deadline (the "Qualified Bidder Notification Deadline"), the Debtors shall notify all Qualified Bidders, including Stalking Horse Bidder, of the identity of all Qualified Bidders and shall provide all Qualified Bidders, including Stalking Horse Bidder, copies of all Qualified Bids. Subject to the terms of the Stalking Horse Agreement, the Qualified Bidder Notification Deadline may be extended by the Debtors, in their sole discretion, at any time and from time to time; provided that, if the Qualified Bidder Notification Deadline is extended, the Debtors will promptly notify each bidder that has already submitted a Qualified Bid and that the Qualified Bidder Notification Deadline shall be at least 24 hours prior to the start of the Auction.

37.   Evaluation of Qualified Bids. Prior to the Auction, the Debtors shall determine, in their reasonable business judgment after consultation with the Debtors' financial and legal advisors and the financial and legal advisors for the Creditors' Committee, which of the Qualified Bids or other bid is should be selected as the Starting Bid, based on numerous factors, including, without limitation, the cash and, subject to the restrictions noted below, non-cash

18

components of each of the Qualified Bids. In such evaluation, the Term Note A and Term Note B shall be deemed to have a value equal to (i) the face amount thereof, as the same may be increased at the Auction, up to the principal amount of the Claims under the Existing Credit Agreement, plus (ii) the value of any principal amount in excess of clause (i) as determined by the Debtors as stated above, and the equity issuable to the holders of Term Note B, as set forth in Section 2.4(c) of the Stalking Horse Agreement, shall be deemed to have a value equal to $3,138,686. The Debtors may take into account any non-cash property included as consideration in such Bid, provided that (a) such Bid meets the minimum cash consideration requirements set forth in the Bidding Procedures and (b) either (i) such non-cash property has a readily ascertainable market value or (ii) or to the extent the Agent (acting at the direction of the Required Lenders under the Existing Credit Agreement) agrees that such non-cash property reduces the Claims under the Existing Credit Agreement secured by Liens on the Purchased Assets.

38. No Qualified Bids. If no Qualified Bids are submitted by the Qualified Bidder Notification Deadline, the Debtors shall cancel the Auction, in which case the Stalking Horse Bidder shall be deemed to be the Successful Bidder.

39. Auction. **In the event that the Debtors receive one or more Qualified Bids from a bidder other than Stalking Horse Bidder, the Debtors shall conduct an Auction with respect to the Purchased Assets.** See Local Rule 6004-1(b)(iv)(D). The Auction will take place starting on January 29, 2010 at 10:00 a.m. (prevailing Eastern Time) at Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware, or at such other place, date and time as may be designated in writing by the Debtors. Other than the Debtors, only (i) Stalking Horse Bidder and its advisors and (ii) Qualified Bidders will be

19

permitted to participate as or with a bidder at the Auction. The Auction generally will be conducted in accordance with the following procedures: (i) only Qualified Bidders shall be entitled to make any subsequent bids at the Auction; (ii) **each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale,** see Local Rule 6004-1(c)(ii)(B); (iii) each Qualified Bidder must appear at the Auction in person or through a duly authorized representative; (iv) prior to the Auction, the Debtors shall provide copies of the Starting Bid to all Qualified Bidders that have informed the Debtors of their intent to participate in the Auction; (v) **Qualified Bidders may submit successive bids with the value to the Debtors, as determined by the Debtors in their reasonable business judgment after consultation with the Creditors' Committee, of at least the Starting Bid plus (A) only in the event that Stalking Horse Bidder's Bid is selected as the Starting Bid, cash equal to the Break-Up Fee plus the Expense Reimbursement, plus (B) $250,000, and then continue in minimum increments of value of at least $250,000 higher than the previous bid; provided that the Debtors shall retain the right to modify the bid increment requirements (other than the $250,000 initial bid increment) at the Auction,** see Local Court Rules 6004-1(c)(i)(B) & 6004-1(c)(1)(D); (vi) the Auction will be conducted in a manner as determined by the Debtors; provided, however, that unless otherwise agreed to in writing by Stalking Horse Bidder, the bids that the Debtors determine to be topping bids pursuant to clause (v) above shall be on the record at the Auction, and no bidders shall be required to submit bids at the Auction in the form of sealed bids; (vii) any subsequent bid submitted by Stalking Horse Bidder shall be credited with the full amount of the Break-Up Fee and Expense Reimbursement potentially payable by the Debtors; (viii) each Qualified Bidder shall have the right to submit additional bids and make additional modifications to its Modified Purchase Agreement at the Auction, provided

20

1357992_5
RLF1 3517612v 1

that any such modifications to the Modified Purchase Agreement, on an aggregate basis and viewed in whole, may not be less favorable to the Debtors than any prior bid by such Qualified Bidder or the preceding bid and that such additional bids comply with the conditions for a Qualified Bid; (ix) the Debtors shall have the right to request any additional financial information that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement and any further information that Debtors believe are reasonably necessary to clarify and evaluate the terms of a Qualified Bidder's bid; and (x) the Debtors shall announce the material terms of each Qualified Bidder's bid and the basis for calculating and the total consideration offered in each such bid.

40. <u>Selection of Successful Bidder</u>. Upon completion of the various steps in the Auction, or as soon thereafter as practicable, the Debtors, in consultation with the Creditors' Committee, will: (i) review each Qualified Bid, and consider each Qualified Bid, in each case as updated through the conclusion of the Auction, on the basis of, among other considerations, the same considerations used by the Debtors in determining the Starting Bid and (ii) identify the highest or otherwise best offer(s) for the Purchased Assets received at the Auction (the "<u>Successful Bid</u>" and the party making such bid, the "<u>Successful Bidder</u>"), as well as identifying the Back-up Bidder. The Auction will be deemed concluded upon the determination of the Successful Bid and the Successful Bidder. The Successful Bidder shall have such rights and responsibilities as set forth in the applicable asset purchase agreement for such Successful Bidder as agreed at the Auction. Within two calendar days following the conclusion of the Auction, if not cancelled, or the Bid Deadline, if the Auction is cancelled, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and

21

containing the terms and conditions upon which the Successful Bid was made. The results at the close of the Auction shall be final, and no additional bids will be accepted after the close of the Auction.

41. <u>Sale Hearing</u>. The Successful Bid will be subject to approval by the Court. The Debtors' presentation of a particular bid to the Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing, which will take place at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801 at a date and time yet to be determined by the Court. Subject to the terms of the Stalking Horse Agreement, the Sale Hearing may be adjourned from time to time without further notice to creditors, bidders or parties in interest other by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

42. <u>Delay in Closing</u>. Prior to the Auction, the Debtor shall notify potential bidders of the Projected Closing Date of Stalking Horse Bidder. For each day following such Projected Closing Date to and including the date that the Successful Bidder closes the Sale, such Successful Bidder shall pay for the liabilities accruing during such period on account of such delay that would otherwise constitute chapter 11 administrative expenses.

43. <u>Failure to Consummate Purchase</u>. **If an Auction is conducted, the party with the next highest or otherwise best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their business judgment and after consultation with the Committee, shall be required to serve as a Back-up Bidder and keep such bid open and irrevocable until the earlier of 5:00 p.m. prevailing Eastern time on the earlier of the date which is thirty (30) days following the Sale Hearing or the closing of the Sale with the**

1357992_5
RLF1 3517612v 1

Buyer (as defined below) (the "Outside Back-up Date"); provided that Stalking Horse Bidder shall not be required to serve as the Back-up Bidder. Following the Sale Hearing, if the Buyer fails to consummate an approved Sale because of buyer's breach or failure to perform, the Back-up Bidder, if any, will be deemed to be the new Successful Bidder, the Back-up Bidder's Qualifying Bid, as updated through the conclusion of the Auction and the Debtors' determination of the Back-up Bidder, shall be deemed to be the new Successful Bid. The Debtors will be authorized, but not required, to consummate the Sale in accordance with such new Successful Bid with the Back-up Bidder without further order of the Court. In such case, the defaulting Buyer's deposit, if any, shall be forfeited to the Debtors and parties in interest, and the Debtors specifically reserve the right to seek all available damages from the defaulting Buyer. See Local Rule 6004-1(c)(i)(E).

44. Return of Deposits. Except as otherwise provided in the Bidding Procedures, all deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-up Bidder by no later than the fifth business day following the conclusion of the Auction; provided however that the interest on such deposit may not be returned until the second business day of the month following such conclusion. The deposit of the Back-up Bidder shall be held by the Debtors until 24 hours after the earlier of the Outside Back-up Date or the date on which the Sale is consummated with the Back-up Bidder upon its designation as the new Successful Bidder.

45. Modification of Bidding Procedures. Subject to the terms of the Stalking Horse Agreement, the Debtors reserve their rights, in the exercise of their fiduciary obligations and after consultation with the Committee, to modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the

1357992_5
RLF1 3517612v 1

**Purchased Assets, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, withdrawing from the Auction the Purchased Assets at any time prior to or during the Auction or canceling the Auction, and rejecting all Qualified Bids.** See Local Court Rule 6004-1(c)(i)(D).

46.     The Debtors believe that the proposed Bidding Procedures provide an appropriate framework for selling the Assets and will enable the Debtors to review, analyze, and compare all Bids received to determine which Bid should be selected as the Successful Bid.

47.     <u>Marketing</u>.  In order to increase the opportunity for the Debtors to receive competitive bids for the purchase of the Assets at the Auction, the Debtors will solicit competing bids leading up to the Bid Deadline.  Under the Debtor's exigent circumstances, Stalking Horse Bidder represents the most logical purchaser for the Assets.  As such, to date, the Debtors focused their efforts on entering into a transaction with Stalking Horse Bidder.  However, upon the filing of this Sale Motion, the Debtors, through the efforts of their investment banker, and subject to the Court's approval of its retention, Barrier Advisors, will market the Assets in order to ensure that the Debtors receive maximum value for the Assets pursuant to the Bidding Procedures.  Barrier Advisors is producing marketing materials that will be distributed to a wide list of potentially interested purchasers that the Debtors, with Barrier Advisor's assistance, will have identified.  These efforts are designed to ensure that information concerning the Debtors, their businesses and their assets and the Auction reaches as wide an audience of potential bidders as possible.

1357992_5
RLF1 3517612v 1

## Proposed Stalking Horse Bid Protections

48.   As part of the Bidding Procedures Order, the Debtors are also requesting approval of the provisions of the Stalking Horse Agreement regarding the Expense Reimbursement, on the terms and conditions set forth in the Stalking Horse Agreement. See Local Rule 6004-1(c)(i)(C). Stalking Horse Bidder insisted that these provisions be included in the Stalking Horse Agreement for acting as a stalking horse bidder. If approved by this Court, and subject to certain conditions being satisfied: (a) if Stalking Horse Bidder terminates the Stalking Horse Agreement pursuant to Sections 8.1(e), Section 8.1(g) or Section 8.1(i), then as Stalking Horse Bidder's sole and exclusive remedy upon such termination and as liquidated damages and not a penalty, the Debtors shall pay Stalking Horse Bidder (i) within two (2) business days after such termination the $500,000 Break-Up Fee and (ii) the Expense Reimbursement; provided that if the Stalking Horse Agreement is terminated pursuant to Section 8.1(e) due to the exercise by the board of directors of any of the Debtors of their fiduciary duties in accepting any other offer or taking any action in contravention of the Stalking Horse Agreement, as contemplated by Section 3(d) of the Restructuring Agreement, then (x) the Expense Reimbursement shall be due and payable within two (2) business days after such termination and (y) the Break-Up Fee shall only become due and payable upon the consummation of a transaction other than the Sale of the Purchased Assets to Stalking Horse Bidder.

49.   The Break-Up Fee and Expense Reimbursement shall be administrative expenses of the Debtors with priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code; provided, however, that notwithstanding anything to the contrary contained in the Bidding Procedures Order, the Debtors shall only be

1357992_5
RLF1 3517612v 1

liable to pay such Expense Reimbursement and Break-Up Fee (i) from the proceeds of the closing of a transaction other than the Sale of the Purchased Assets to Stalking Horse Bidder, (ii) from property of the Debtors' estates on which the Existing Senior Term Lenders do not have a valid, perfected and unavoidable first-priority lien, or (iii) as a condition to confirmation of a plan that does not provide for the Sale of the Purchased Assets to Stalking Horse Bidder in accordance with the terms and conditions set forth in the Stalking Horse Agreement. The Break-Up Fee and Expense Reimbursement shall survive termination of the Stalking Horse Agreement.

50. Under Third Circuit precedent, expense reimbursements constitute administrative expenses, and therefore, the payment of such expenses must provide a post-petition benefit to the bankruptcy estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999). In O'Brien, the Third Circuit stated that a potential benefit accruing from the reimbursement of expenses of a stalking horse bidder is that such payment encourages potential bidders to thoroughly evaluate a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id. The Debtors submit that the proposed Bidding Protections will not chill bidding, are reasonable, and will enable the Debtors to maximize the value of the Assets.

51. Under the circumstances, the Bidding Protections have benefitted the Debtors' estates. Stalking Horse Bidder has advised the Debtors that it would not have entered into the Stalking Horse Agreement on the terms proposed had the Debtors not agreed to the Break-up Fee and the Expense Reimbursement. Also, as a direct result of the efforts of Stalking Horse Bidder in evaluating the Debtors' businesses and assets, the Purchase Price set forth in the Stalking

Horse Agreement is expected to encourage competing bids. The Purchase Price can serve as a platform for others to devise their bids.

### Proposed Notice of the Bidding Procedures, the Auction, and the Sale Hearing

52.     The Debtors propose that the Court set 4:00 p.m. (prevailing Eastern Time) on January 28, 2010 as the deadline for objecting to approval of the proposed Sale (the "Objection Deadline").

53.     The Debtors have provided notice of this Sale Motion by first class mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the twenty (20) largest unsecured claims; (c) counsel to Agent; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the United States Department of Justice; (g) counsel to the Debtors' controlling shareholder; and (h) the relevant taxing authorities  The Debtors respectfully submit that no further notice of this Sale Motion is required.

54.     As part of the Bidding Procedures Order, the Debtors will be seeking approval of the Sale Notice. The Sale Notice will include, among other things, the date, time, and place of the Auction and the Sale Hearing, as well as the deadline for filing any objections to the relief requested in this Sale Motion once these are set by the Court. The Debtors propose to serve the Sale Notice on all parties provided with the notice of this Sale Motion, all parties identified by the Debtors and Barrier Advisors as potentially interested purchasers, and all parties on the Debtors' lists of creditors. The Sale Notice will also include instructions on how to obtain copies of this Sale Motion and the Stalking Horse Agreement. The Debtors also propose to publish the Sale Notice in one edition of USA Today as soon as practicable following entry of the Bidding Procedures Order.

27

55.     The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed Bidding Procedures and the sale of the Assets. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

### The Proposed Procedures for of the Assumption and
### Assignment or Rejection of Executory Contracts and Unexpired Leases

56.     Additionally, the Debtors, as part of the Sale, are seeking (i) to assume and assign certain executory contracts and unexpired leases (the "Assigned Contracts"), (ii) to reject certain executory contracts and unexpired leases (the "Rejected Contracts"), and (iii) to identify certain executory contracts and unexpired leases (the "Potentially Assigned Contracts") which will be subject to later designation as an Assigned Contract or a Rejected Contract during a 30-day period beginning on the Closing Date (the "Contract Option Period"). As soon as practicable following entry of the Bidding Procedures Order, the Debtors will serve the Assumption and Assignment Notice by first class mail on all non-debtor parties to executory contracts and unexpired leases. The Assumption and Assignment Notice will inform each recipient that its respective executory contract or unexpired leases is designated as either an Assigned Contract, a Rejected Contract, or a Potentially Assigned Contract. During the Contract Option Period, Stalking Horse Bidder may designate, by written notice to the Debtors, (i) which of the Potentially Assigned Contracts are to be treated as Rejected Contracts (such notice, the "Rejection Notice") and (ii) which of the Potentially Assigned Contracts are to be treated as Assigned Contracts (such notice, the "Assumption Notice"). The Assumption and Assignment Notice will include Cure Amounts that will apply in the event that the applicable executory contract or unexpired lease is to be assumed and assigned. In the event that an executory contract or unexpired lease will be assumed after the Sale Hearing, the counterparty will receive

28

a notice of assumption and assignment of such contract or lease (the "Post-Closing Assumption Notice"), which notice will provide the counterparty an opportunity to object to the proposed adequate assurance of future performance. In the event that the counterparty does not object to the Post-Closing Assumption Notice within 10 days following service of this notice, such Potentially Assigned Contract will be deemed an Assigned Contract. In the event that the counterparty objects to the Post-Closing Assumption Notice, the Debtors will request a hearing, the sole issue at which will be the proposed adequate assurance of future performance.

57. At all times (x) with respect to any Potentially Assigned Contract for which a Rejection Notice is timely delivered, from the Closing until the date on which Stalking Horse Bidder delivers a Rejection Notice with respect to such Potentially Assigned Contract or (y) with respect to all other Potentially Assigned Contracts, from and after the Closing, Stalking Horse Bidder shall (i) be entitled to receive any payments that the Debtors receive on account of the Potentially Assigned Contracts during such period and (ii) pay and be solely responsible for all liabilities and obligations accruing during such period arising under Potentially Assigned Contracts to the extent such liabilities and obligations first arise on or after the Closing Date, would otherwise constitute chapter 11 administrative expenses, and do not arise as a result of any default by the Debtors under such Potentially Assigned Contracts. Such performance by Stalking Horse Bidder shall not be deemed to be an explicit or implicit assumption by Stalking Horse Bidder of any executory contract or unexpired lease.

58. No later than one day prior to the Sale Hearing, the Debtors or Stalking Horse Bidder will file and serve on the applicable counterparties: (a) a list of executory contracts and unexpired leases that have, as of that date, been determined to be Assigned Contracts; and (b) a list of executory contracts and unexpired leases that have, as of that date, been determined to be

29

Rejected Contracts and will not be subject to the Contract Option Period. Pursuant to section 365 of the Bankruptcy Code, and without further notice, the Debtors will be authorized to assume and assign all Assigned Contracts listed in clause (a) above, and Rejected Contracts listed in clause (b) above will be deemed rejected, both as of the date of the Sale Hearing.

59. Any objections to the assumption and assignment of the executory contracts and unexpired leases, the adequate assurance of future performance of such executory contracts and unexpired leases, and the Debtors' proposed Cure Amounts (a "Contract Objection"), must: (a) be in writing; (b) state with specificity the nature of such objection and alleged cure amount, including applicable and appropriate documentation in support of such alleged cure amount; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Court, on or before the deadline specified in the Bidding Procedures Order (the "Cure Objection Deadline"), or such later date and time as the Debtors may agree; and (e) be served upon the parties identified in Paragraph 26 of the Bidding Procedures Order, so as to be actually received on or before the Cure Objection Deadline.

60. If a counterparty to an executory contract or unexpired lease does not timely and properly file a Contract Objection in the manner set forth above, the Debtors' proposed Cure Amount shall be fixed and shall be paid to the counterparty to the executory contract or unexpired lease to the extent such contract is assumed and assigned, and the counterparty shall be deemed to consent to the assumption and assignment of the executory contract or unexpired lease. If a counterparty timely and properly files a Contract Objection, then, as set forth in the Assumption and Assignment Notice, such counterparty shall have the opportunity to appear before the Court at the Sale Hearing. In order for the Debtors to assume and assign any of the executory contracts or unexpired leases, the proposed Cure Amount determined by the Court (if

the counterparty objects) or set forth in the Assumption and Assignment Notice (if there is no objection) must be paid to the counterparty to the executory contract or unexpired lease.

61.     If a Contract Objection is not timely and properly filed and served in accordance with the Bidding Procedures Order, (a) the Debtors' proposed Cure Amount shall be controlling with respect to the executory contract or unexpired lease, notwithstanding anything to the contrary in any executory contract or unexpired lease or other document, (b) such contract or lease may be assigned to the Successful Bidder, (c) the failure to object shall be deemed consent to the assumption and assignment for the purposes of section 365(c) of the Bankruptcy Code or otherwise, (d) the counterparty to the executory contract or unexpired lease shall be forever barred from asserting any other claim arising prior to the assignment, if applicable, against the Debtors or the Successful Bidder as to such executory contract or unexpired lease, and (e) with respect to the executory contract or unexpired lease, the Successful Bidder's promise to perform under the executory contract or unexpired lease shall be deemed adequate assurance of future performance under the executory contract or unexpired lease; provided, however, that any counterparty that receives a Post-Closing Assumption Notice will have the opportunity to object to the proposed adequate assurance of future performance.

62.     In accordance with the procedures set forth above, the Debtors request that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code. See In re Decora Indus., 2002 WL 32332377, at *4 (Bankr. D. Del. May 17, 2002) (parties in interest who did not object to sale were deemed to accept the sale pursuant to sections 362(f) and 365 of the Bankruptcy Code); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican

31

Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

### The Sale of the Assets Pursuant to the Stalking Horse Agreement Is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment

63. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, the Second Circuit has required that such use, sale or lease be based upon the sound business judgment of the debtor. See The Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business). In that regard, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

64. The business judgment rule shields a debtor's management from judicial second-guessing. Johns-Manville Corp., 60 B.R. at 615-16 ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification,

32

"[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" The Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

65. The fairness and reasonableness of the consideration to be paid by the Successful Bidder will be demonstrated by adequate "market exposure" and fair auction process—the best means for establishing whether a fair and reasonable price is being paid. In order to ensure a fair auction process, the Debtors will solicit interest from numerous potential purchasers and engage in the marketing process described in paragraphs 26-27 above. In addition, the Stalking Horse Agreement provides for a floor in the bidding process that exceeds the liquidation value of the Assets.

## The Sale of the Assets Free and Clear of Liens and Other Interests Is Authorized By Section 363(f)

66. The Debtors further submit that it is appropriate to sell the Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the net sale proceeds of the Assets to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

33

(a)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

67.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

68.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[S]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) is written in the disjunctive, and holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met).

69.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Assets pursuant to the Stalking Horse Agreement. In particular, the Debtors believe that at least section 363(f)(2) will be met in connection with the

34

transactions proposed under the Stalking Horse Agreement because each of the parties holding liens on the Assets will consent, or absent any objection to this Sale Motion will be deemed to have consented to, the Sale. Accordingly, section 363(f) authorizes the transfer and conveyance of the Assets free and clear of any such claims, interests, liabilities or liens.

70. Under the terms of the Stalking Horse Agreement, the Successful Bidder will assume and agree to pay, to perform, and to discharge as and when they become due and payable, or are required to be performed, all liabilities which are to be performed by such Successful Bidder on and after consummation of the Sale. **The Successful Bidder is not liable for any of the Debtors' liabilities in connection with the sale of the Assets as a successor to the Debtors' business or otherwise.** See Local Rule 6004-1(b)(iv)(L). Extensive case law exists providing that claims against the winning bidder are directed to the proceeds of a free and clear sale of property and may not be asserted against a buyer subsequently.

71. Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined in the Bankruptcy Code. Foleer Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000). In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited extensively and with approval by the Third Circuit in Folger, supra, the scope of section 363(f) is not limited

35

to in rem interests. Thus, the Third Circuit in <u>Folger</u> stated that Leckie held that debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." <u>Folger</u>, 209 F.3d at 258.

72.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. <u>See</u> <u>The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.</u>, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); <u>MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); <u>In re New England Fish Co.</u>, 19 B.R. 323, 329 (Bankr. W.D. Wash 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); <u>In re Hoffman</u>, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); <u>American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.)</u>, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); <u>WBQ Partnership v. Virginia Dept. of Medical Assistance Services (In re WBQ Partnership)</u>, 189 B.R. 97, 104-05 (Bankr. 22 E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).   The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the Successful Bidder arising from the Debtors' pre-sale conduct. Under section 363(f) of the Bankruptcy Code, the Successful Bidder is entitled to know

36

that the Assets are not subject to latent claims that will be asserted against the Successful Bidder

after the proposed transaction is completed. Accordingly, consistent with the above-cited case

law, the order approving the sale of the Assets should state that the Successful Bidder is not

liable as a successor under any theory of successor liability for claims that encumber or relate to

the Assets.

### The Successful Bidder is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Transfer of the Assets Does Not Violate Section 363(n)

73.     The Debtors request that the Court find that the Successful Bidder is entitled to

the full protections of section 363(m) of the Bankruptcy Code. The Second Circuit has indicated

that a party would have to show fraud or collusion between the buyer and the debtor-in-

possession or trustee or other bidders in order to demonstrate a lack of good faith. See Kabro

Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269,

276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status

at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or

an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films,

57th, Inc., 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr.

E.D.N.Y. 1998). The parties have disclosed that Stalking Horse Bidder is a wholly-owned

subsidiary of Parent, that Parent in turn is owned by the Equity Investors, each of which is a

Lender or a shareholder of Ames Holding, and that the Equity Investors intend to capitalize

Stalking Horse Bidder with $10 million. In addition, Stalking Horse Bidder will have access to a

senior revolving loan facility and a junior term facility. The parties anticipate that members of

the Debtors' current management may assume management roles at Stalking Horse Bidder, but

the parties have not solicited or obtained commitments from members of management with

respect to their potential roles at Stalking Horse Bidder. Other bidders are free to contact members of management to solicit their interest in continuing to maintain a management role under that bidders' bid, were it to be successful. Under the circumstances, where the Lenders have liens on all, or substantially all of the Debtor's assets or, where appropriate, liens and security interest on the proceeds of such assets, and the assets have been fairly marketed for overbid, if the Successful Bidder is Stalking Horse Bidder, it should be entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

### The Assumption and Assignment of the Assigned Contracts and the Rejection of the Rejected Contracts Should be Authorized

74. Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). In turn, section 365(f)(2) of the Bankruptcy Code provides in pertinent part:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)   the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)   adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

75. Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor. This subsection provides:

> (b)(1)   If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default … ;

38

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease. 11 U.S.C. § 365(b)(1).

By and through this Motion, the Debtors are seeking to assume and assign the Assigned Contracts.

76.     There are no incurable defaults under any of the Assigned Contracts. The Debtors do believe, however, that there are certain amounts due under some of these agreements, and consistent with the Stalking Horse Agreement, any such defaults will be cured by Stalking Horse Bidder as part of any assumption and assignment.

77.     Moreover, the Debtors submit that the Sale provides all parties to the Assigned Contracts with adequate assurance of future performance. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

78.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in

39

order to give it strong likelihood of succeeding). The proposed Bidding Procedures will provide the Court and other interested parties with the opportunity to evaluate and, if necessary, challenge the ability of Stalking Horse Bidder or other Successful Bidder to provide adequate assurance of future performance under such agreements, as required under section 365(b)(1)(C) of the Bankruptcy Code. The Court should therefore authorize the Debtors to assume and assign the Assigned Contracts as set forth in this Sale Motion.

79.     Through this Sale Motion, the Debtors also seek to reject the Rejected Contracts. section 365(a) of the Bankruptcy Code authorizes a debtor in possession, subject to the court's approval, to reject any executory contract or unexpired lease of the debtor if the rejection is a reasonable exercise of business judgment. See NLRB v. Bildisco & Bildisco (In re Bildisco), 682 F.2d 72, 79 (3d Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."). See also In re Federal Mogul Global, Inc., 293 B.R. 124, 126 (D. Del. 2003); In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003). The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim or caprice. See In re Trans World Airlines, Inc., 261 B.R. 103, 121 (Bankr. D. Del. 2001). See also Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstance, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course"); In re Constant Care Community Health Center, Inc., 99 B.R. 697 (Bankr. D. Md. 1989). Under section 365(a) of the Bankruptcy Code, the standard for rejection of executory contracts and unexpired leases is whether such exercise by a debtor is conducted with reasonable business judgment and that such rejection would provide a benefit to the estate. Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141

F.3d 490, 492 (3d Cir. 1998); In re Taylor, 913 F.2d 102, 107 (3d Cir. 1990); In re Hardie, 100 B.R. 284 (Bankr. E.D.N.C. 1989). Thus, a court must examine the debtor's decision to assume or reject under the "business judgment" test to determine if assumption or rejection would be beneficial to the estate. In re Gateway Apparel, Inc., 210 B.R. 567, 570 (Bankr. E.D. Mo. 1997).

80.     Upon Court approval of the transaction, whether a sale to Stalking Horse Bidder or to a competing bidder, the Debtors will have sold substantially all of their assets and will have no further need for the Rejected Contracts. To the extent that any of the Rejected Contracts constitute leases of non-residential real property, the Debtors will have no further use for any of the leased premises, would not have the means to cure the defaults under these leases in order to assume and assign them, and do not believe that there is any value to be gained from marketing any of these Rejected Contracts, including any unexpired non-residential real property leases. As a result, there is more than sufficient basis to support the Debtor's decision to seek to reject the Rejected Contracts.

81.     With respect to the Potentially Assigned Contracts, under the terms of the Stalking Horse Agreement, if Stalking Horse Bidder is the Successful Bidder, Stalking Horse Bidder, by written notice to the Debtors, will designate which of the Potentially Assigned Contracts are to be treated as Rejected Contracts and which are to be treated as Assigned Contracts.

82.     With respect to any Potentially Assigned Contract which is the subject of an Assumption Notice, the Debtor shall serve upon the other party to such Potentially Assigned Contract a notice of the proposed assumption and assignment of such contract (the "Post-Closing Assumption Notice"). Through this Post-Closing Assumption Notice, the Debtors will provide the other party an opportunity to object to the proposed adequate assurance of future

41

performance under such Potentially Assigned Contract. If the party does not object to the Post-Closing Assumption Notice within ten days following service of this notice, such Potentially Assigned Contract will be deemed an Assigned Contract, without further order of the Court or notice to any other parties. If the party timely objects to the Post-Closing Assumption Notice, the Debtors will request that the Court schedule a hearing on such objection, the sole issue at the hearing being whether the proposed assurance of future performance under such Potentially Assigned Contract is adequate.

83. Through this Sale Motion, the Debtors seek Court approval of the procedures described above for the treatment of all executory contracts and unexpired leases of the Debtors. The Debtors believe that these procedures are fair and reasonable under the circumstances and provide the other parties to these contracts and leases and all other interested parties with a sufficient opportunity to object to any proposed treatment.

## Payment of Sale Transaction Fee

84. As discussed above, the Debtors have retained Barrier Advisors to assist the Debtors in marketing the Assets in the hope of soliciting competing bids. Through a separate motion, the Debtors are seeking Court approval for Barrier Advisors to continue to provide these investment banking services for the benefit of the Debtors and their estates post-petition.

85. As compensation for their services, Barrier Advisors is seeking, among other things, a fee calculated and payable in accordance with the terms of the Order entered by this Court approving the Debtors retention of Barrier Advisors (the "Sale Transaction Fee").

86. Through this Sale Motion, the Debtors seek to have the Bidding Procedures Order and the Sale Order specify that the Sale Transaction Fee shall be paid only from the proceeds from the actual closing of such Court-approved sale and in accordance with the Court's Orders.

42

## Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

87.    **The Debtors request that the Sale Order contain a provision waiving the 14-day stay under Bankruptcy Rule 6004(h) and 6006(d).** See Local Rule 6004-1(b)(iv)(O). Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that any order approving the Stalking Horse Agreement, or Modified Purchase Agreement of a Successful Bidder, be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

88.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier suggests that this stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

89.    The Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the sale is filed,

43

reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## Notice

90. The Debtors have provided notice of this Sale Motion by first class mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the twenty (20) largest unsecured claims; (c) counsel to Agent; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the United States Department of Justice; (g) counsel to the Debtors' controlling shareholder; (h) the relevant taxing authorities; and (i) parties requesting notice pursuant to Bankruptcy Rule 2002(i). The Debtors respectfully submit that no further notice of this Sale Motion is required.

91. Following the entry of the Bidding Procedures Order, the Sale Notice will be served on all parties provided with the notice of this Sale Motion, all parties identified by the Debtors and Barrier Advisors as potentially interested purchasers, and all parties on the Debtors' lists of creditors. Additionally, the Debtors will publish the Sale Notice in one edition of the USA Today as soon as practicable after the entry of the Bidding Procedures Order.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order substantially in the form attached hereto as Exhibit A, (ii) enter the Sale Order substantially in the form attached hereto as Exhibit C after the Sale Hearing, and (iii) grant such other and further relief to the Debtors as the Court may deem proper.

[Signatures begin on the following page]

1357992_5
RLF1 3517612v 1

Dated: December 16, 2009
Wilmington, Delaware

Respectfully submitted,

_Katherine Good_

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
L. Katherine Good (No. 5101)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

C. Edward Dobbs
Rufus T. Dorsey, IV
PARKER, HUDSON, RAINER & DOBBS LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303
Telephone: (404) 523-5300
Facsimile: (404) 522-8409

*Proposed Counsel For the Debtors and Debtors-in-Possession*

1357992_5
RLF1 3517612v 1