## Exhbit B

**Form of Asset Purchase Agreement**

# ASSET PURCHASE AGREEMENT

among

## AXIA INCORPORATED,

## AMES HOLDING CORP.,

## AMES TAPING TOOL SYSTEMS, INC.,

## TAPETECH TOOL CO., INC.,

and

## AXIA ACQUISITION CORPORATION

**Dated as of December __, 2009**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ........................................................................................... 1
    Section 1.1    Definitions. ......................................................................... 1
    Section 1.2    Interpretation and Rules of Construction. ......................... 12

ARTICLE II PURCHASE AND SALE ...................................................................... 13
    Section 2.1    Purchase and Sale of Assets. ............................................ 13
    Section 2.2    Assumption and Exclusion of Liabilities. ........................ 16
    Section 2.3    Purchase of Purchased Assets. ......................................... 17
    Section 2.4    Purchase Price. ................................................................. 18
    Section 2.5    Allocation of the Purchase Price. ..................................... 18
    Section 2.6    Determined Cure Costs; Trade Payables Schedule. ......... 18
    Section 2.7    Closing. ............................................................................ 19
    Section 2.8    Closing Deliveries by the Sellers. .................................... 19
    Section 2.9    Closing Deliveries by the Purchaser. ............................... 20
    Section 2.10    Relinquishment of Control. .............................................. 21
    Section 2.11    Assignment of Contracts and Rights. ............................... 21

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS ............... 22
    Section 3.1    Organization, Authority and Qualification of the Sellers. ................ 22
    Section 3.2    No Conflict. ...................................................................... 22
    Section 3.3    Governmental Consents and Approvals. .......................... 23
    Section 3.4    SEC Filings; Financial Statements; Undisclosed Liabilities. ........... 23
    Section 3.5    Litigation. ......................................................................... 23
    Section 3.6    Compliance with Laws. .................................................... 24
    Section 3.7    Environmental Matters. .................................................... 24
    Section 3.8    Intellectual Property. ........................................................ 24
    Section 3.9    Real Property. ................................................................... 25
    Section 3.10    Employee Benefit Matters. ............................................... 26
    Section 3.11    Taxes. ............................................................................... 27
    Section 3.12    Material Contracts. ........................................................... 28
    Section 3.13    Brokers. ............................................................................ 29
    Section 3.14    Title to Purchased Assets. ................................................ 29
    Section 3.15    Insurance. ......................................................................... 29
    Section 3.16    Suppliers and Customers. ................................................. 29
    Section 3.17    Permits. ............................................................................ 30
    Section 3.18    Absence of Certain Changes. ............................................ 30
    Section 3.19    Labor Matters. .................................................................. 30
    Section 3.20    Inventory. ......................................................................... 31
    Section 3.21    Receivables. ...................................................................... 31
    Section 3.22    Transactions with Related Parties. .................................... 31

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ....... 32
    Section 4.1    Organization and Authority of the Purchaser. .................. 32

| Section 4.2 | No Conflict. | 32 |
|---|---|---|
| Section 4.3 | Governmental Consents and Approvals. | 33 |
| Section 4.4 | Litigation. | 33 |
| Section 4.5 | Brokers and Finders. | 33 |

ARTICLE V ADDITIONAL AGREEMENTS................................................................33

| Section 5.1 | Assumption of Assigned Contracts. | 33 |
|---|---|---|
| Section 5.2 | Conduct of Business Prior to the Closing. | 34 |
| Section 5.3 | Access to Information. | 37 |
| Section 5.4 | Damage or Destruction. | 38 |
| Section 5.5 | Regulatory and Other Authorizations; Notices and Consents. | 38 |
| Section 5.6 | Permits and Licenses. | 38 |
| Section 5.7 | Environmental Related Actions. | 39 |
| Section 5.8 | Intellectual Property. | 39 |
| Section 5.9 | Further Action. | 39 |
| Section 5.10 | Tax Cooperation and Exchange of Information. | 40 |
| Section 5.11 | Conveyance Taxes. | 40 |
| Section 5.12 | Nondisclosure. | 41 |
| Section 5.13 | Documents at Closing. | 41 |
| Section 5.14 | Parties' Access to Records After Closing. | 41 |
| Section 5.15 | Notification of Certain Matters. | 41 |
| Section 5.16 | Waiver and Release. | 42 |
| Section 5.17 | Bankruptcy Court Matters. | 42 |

ARTICLE VI EMPLOYEE MATTERS ..............................................................43

| Section 6.1 | Transferred Employees. | 43 |
|---|---|---|
| Section 6.2 | No Obligation. | 43 |

ARTICLE VII CONDITIONS TO CLOSING..........................................................44

| Section 7.1 | Conditions to Obligations of the Sellers. | 44 |
|---|---|---|
| Section 7.2 | Conditions to Obligations of the Purchaser. | 44 |

ARTICLE VIII TERMINATION, AMENDMENT AND WAIVER....................................46

| Section 8.1 | Termination. | 46 |
|---|---|---|
| Section 8.2 | Effect of Termination. | 47 |

ARTICLE IX GENERAL PROVISIONS................................................................47

| Section 9.1 | Break-up Fee; Expense Reimbursement | 47 |
|---|---|---|
| Section 9.2 | Expenses. | 48 |
| Section 9.3 | Notices. | 48 |
| Section 9.4 | Public Announcements. | 49 |
| Section 9.5 | Severability. | 49 |
| Section 9.6 | Entire Agreement. | 49 |
| Section 9.7 | Successors and Assigns. | 49 |
| Section 9.8 | Amendment. | 50 |
| Section 9.9 | Waiver. | 50 |

Section 9.10    No Third Party Beneficiaries. ............................................................50
Section 9.11    Governing Law. ..................................................................................50
Section 9.12    Waiver of Jury Trial............................................................................51
Section 9.13    Currency..............................................................................................51
Section 9.14    Construction. ......................................................................................51
Section 9.15    Counterparts. ......................................................................................51

<u>EXHIBITS</u>

Exhibit A      --      Form of Assignment of Intellectual Property
Exhibit B      --      Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit C      --      Budget
Exhibit D      --      Form of Deed
Exhibit E      --      Purchaser's Disclosure Schedule
Exhibit F      --      Sellers' Disclosure Schedule
Exhibit G      --      Form of Bid Procedures Order
Exhibit H      --      Sale Order Terms

ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of December __, 2009, among Axia Incorporated, a Delaware corporation ("Axia"), Ames Taping Tool Systems, Inc., a Delaware corporation ("Ames"), TapeTech Tool Co., Inc., a Delaware corporation ("TapeTech") and Ames Holding Corp., a Delaware corporation ("Ames Holding," together with Axia, Ames and TapeTech referred to as the "Sellers"), and Axia Acquisition Corporation, a Delaware corporation (the "Purchaser").

## RECITALS

WHEREAS, the Sellers are engaged in the business of leasing and selling tooling used in drywall applications (the "Business");

WHEREAS, the Sellers are commencing voluntary cases under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Sellers wish to sell, assign and transfer to the Purchaser, and the Purchaser wishes to purchase and acquire from the Sellers, the Purchased Assets (as defined below) free and clear of all liens, claims, encumbrances and interests other than as expressly permitted hereunder and, in connection therewith, the Purchaser is willing to assume all of the Assumed Liabilities (as defined below), all upon the terms and subject to the conditions set forth herein;

WHEREAS, the board of directors (or equivalent or similar governing body) of each Seller believes, following consultation with its financial advisors and reasonable due diligence, that, in light of the current circumstances, a sale of its assets is necessary to maximize value and is in the best interest of such Seller and its stockholders and creditors; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to this Agreement and a Sale Order (as defined below) to be entered in the Bankruptcy Case and other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the promises and the representations, warranties, agreements and covenants hereinafter set forth, and intending to be legally bound, the Sellers and the Purchaser hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1          Definitions.

For purposes of this Agreement:

"Action" means any Claim, action, complaint, suit, litigation, arbitration, appeal, petition, demand, inquiry, hearing, proceeding, investigation or other dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority or any third person.

"Affected Assets" has the meaning given to it in Section 5.4.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Agreement" has the meaning given to it in the Preamble.

"Allocation" has the meaning given to it in Section 2.5.

"Alternative Transaction" means (a) a proposal by any party other than Purchaser to make an investment in any Seller or to purchase all or substantially all of a Seller's assets through one or more sale(s) authorized under Section 363 of the Bankruptcy Code or through confirmation of a plan under Section 1129 of the Bankruptcy Code (other than the Plan Alternative) or (b) any other transaction with a party other than Purchaser (other than the Plan Alternative) that is conditioned or predicated on the transactions contemplated hereby not being completed in accordance with the terms of this Agreement or is intended or could reasonably be expected to result in such transactions not being so completed.

"Ames" has the meaning given to it in the introductory paragraph hereto.

"Ames Holding" has the meaning given to it in the introductory paragraph hereto.

"Ancillary Agreements" means the Bill of Sale and Assignment and Assumption Agreement, the Deeds, the Assignments of Intellectual Property and any other instrument or agreement contemplated by this Agreement or the foregoing.

"Assigned Contract" means any Contract concerning Transferred Intellectual Property or that relates to, or is used or useful in or held for use in, the Business, including any Material Contract, but excluding any Excluded Contract.

"Assignments of Intellectual Property" means the Assignments of Owned Intellectual Property to be executed and delivered by the Sellers and the Purchaser at the Closing, substantially in the form attached hereto as Exhibit A.

"Assumed Liabilities" has the meaning given to it in Section 2.2(a).

"Avoidance Claims" means all avoidance Claims and causes of action under Sections 544 through 550 and 553 of the Bankruptcy Code and any related Claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds thereof.

"Axia" has the meaning given to it in the introductory paragraph hereto.

"Bankruptcy Code" has the meaning given to it in the recitals hereto.

"Bankruptcy Court" has the meaning given to it in the recitals hereto.

"Bid Procedures Order" has the meaning given to it in Section 7.2(d).

"Bill of Sale and Assignment and Assumption Agreement" means the Bill of Sale and Assignment and Assumption Agreement to be executed and delivered by the Sellers and the Purchaser at the Closing, substantially in the form attached hereto as Exhibit B.

"Budget" means the budget attached hereto as Exhibit C.

"Business" has the meaning given to it in the recitals hereto.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of Illinois.

"Business Employees" means all current employees, officers and directors of Sellers who perform as of the date hereof services primarily related to the Business.

"Canadian Entity" means Ames Taping Tools of Canada, Ltd.

"Cash Collateral Order" means any interim or final order entered at any time by the Bankruptcy Court in the Bankruptcy Case authorizing the use by any of the Sellers of cash, including, without limitation, any exhibit, appendix or supplement attached to or incorporated by reference in any such order.

"Chapter 11 Cases" has the meaning given to it in the recitals hereto.

"Claim" has the meaning given to it Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning given to it in Section 2.7.

"Closing Date" has the meaning given to it in Section 2.7.

"Consent" means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with or notice to, any Governmental Authority or other Person.

"Contracts" means any contract, arrangement, note, bond, commitment, purchase order, sales order, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs, policies or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by Contract, credit arrangement or otherwise.

"Conveyance Taxes" means all sales, use, value added, transfer, stamp, stock transfer, real property transfer and similar Taxes.

"Deed" means, with respect to each parcel of Owned Real Property, the instrument of conveyance customary to the applicable jurisdiction in registrable or recordable form where applicable, to be executed and delivered by the applicable Seller at the Closing in order to convey to the Purchaser such Seller's interest, if any, in such parcel of Owned Real Property, free and clear of all Liens, other than Permitted Encumbrances, substantially in the form attached hereto as Exhibit D.

"Designated Trade Payables" means trade payables of the Sellers to third parties (other than to any Seller or any Affiliate of any Seller) arising from the conduct of the Business, that are specifically designated by the Purchaser in a written notice to the Sellers delivered prior to the Closing as included within the Assumed Liabilities; provided that to be deemed a Designated Trade Payable the following conditions must also be met: (i) such trade payables shall be disclosed on the schedule of Trade Payables prepared in accordance with Section 2.6(b) or incurred in accordance

with <u>Section 5.2(a)</u>, and (ii) the party to whom such payable is owed must have agreed to continuing credit terms with Purchaser on a post-Closing basis.

"<u>Determined Cure Costs</u>" means, in the aggregate, all amounts payable to counterparties of Assigned Contracts on account of the assumption of the Assigned Contracts by the Sellers as determined pursuant to a Final Order, which Order may be the Sale Order.

"<u>Employee Plans</u>" means (i) all employee benefit plans (as defined in Section 3(3) of ERISA, and all bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, active or retiree medical or life insurance, hospital, dental, vision care, drug, sick leave, disability (including short term disability and long term disability), salary continuation, maternity or paternity, legal benefits, unemployment benefits, pension, supplemental retirement, savings, severance, fringe or other benefit plans, programs or arrangements, and all employment, consulting, termination, severance or other contracts or agreements, to which any of the Sellers or ERISA Affiliates is a party, with respect to which any Seller or ERISA Affiliate has any obligation or which are maintained, contributed to or sponsored by a Seller or ERISA Affiliate for the benefit of any Business Employee; (ii) each employee benefit plan related solely to the Business for which any of the Sellers could incur liability under Section 4069 of ERISA in the event such plan has been or were to be terminated; (iii) any plan related solely to the Business in respect of which any of the Sellers could incur liability under Section 4212(c) of ERISA; and (iv) any Contracts between any of the Sellers or any of their Affiliates, and any Business Employee.

"<u>Environmental Claim</u>" means any and all written complaints, summons, citations, directives, orders, claims, litigation, investigations, notices of violation, judgments, administrative, regulatory or judicial actions, suits, demands or proceedings, or written notices of noncompliance or violation by any Governmental Authority or Person involving or alleging potential liability arising out of or resulting from any violation of Environmental Law or the presence or Release of Hazardous Material from or relating to: (i) any of the Owned Real Property, Leased Real Property or any other assets, properties or businesses of Sellers or any of their respective predecessors in interest; (ii) any adjoining properties or businesses; or (iii) any facilities receiving or handling Hazardous Materials generated by any of the Sellers or any of their respective predecessors in interest.

"<u>Environmental Law</u>" means all Federal, state, local and foreign laws, statutes, ordinances, rules, regulations, permits, licenses, registrations, orders, judgments, decrees, injunctions, or legally enforceable requirements of any Governmental Entity which are in existence on the date hereof, and all final court orders and decrees and arbitration awards imposing liability or establishing standards of conduct for protection of the environment and human health and safety including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq., as amended; the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended; the Clean Air Act, 42 U.S.C. 7401 et seq., as amended; the Clean Water Act, 33 U.S.C. 1251 et seq., as amended; the Occupational Safety and Health Act, 29 U.S.C. 655 et seq; and any environmental property transfer law that may require notice, site investigation or remedial action arising from the sale or transfer of a property.

"<u>Environmental Liability</u>" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, natural resource damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any Claim or demand by any governmental authority or any third party, and which relate to any environmental condition, violation or alleged violation of Environmental Laws or Releases of Hazardous Materials from (i) any of the Owned Real Property, Leased Real Property or any other assets, properties or businesses of any Seller or any of their respective predecessors in interest; (ii) from

adjoining properties or businesses; or (iii) from or onto any facilities which received Hazardous Materials generated by any Seller or any predecessor in interest of any Seller

"Environmental Permits" means any permit, registration, certificate, qualification, approval, identification number, license and other authorization required under or issued pursuant to any applicable Environmental Law or otherwise required by any applicable Governmental Authority.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means a person required at any particular time to be aggregated with any of the Sellers under Sections 414(b), (c), (m) or (o) of the Tax Code or Section 4001 of ERISA.

"Excluded Assets" has the meaning given to it in Section 2.1(b).

"Excluded Cash" means cash in an amount necessary to fund in full the Carve-Out under (and as defined in) the Cash Collateral Order.

"Excluded Contract" has the meaning given to it in Section 5.1(a).

"Excluded Liabilities" has the meaning given to it in Section 2.2(b).

"Excluded Taxes" means (i) all Taxes (other than Lien Taxes) relating to the Purchased Assets or the Business for any Pre-Closing Period and (ii) any income Taxes imposed on the Sellers. For purposes of this Agreement, in the case of any Straddle Period, (a) Property Taxes relating to the Purchased Assets allocable to the Pre-Closing Period shall be equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that fall within the portion of the Straddle Period ending on (and including) the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and (b) Taxes (other than Property Taxes) relating to the Purchased Assets for the Pre-Closing Period shall be computed as if such taxable period ended on the Closing Date.

"Executory Contract Option Period" has the meaning given to it in Section 5.1(a).

"Existing Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of April 1, 2008, by and among Axia (as successor in interest to Ames Merger Sub Corp.), UBS AG, Stamford Branch (as the issuing bank, administrative agent, senior collateral agent and subordinated collateral agent), and certain other lenders parties thereto as amended prior to the date hereof.

"Existing Senior Term Lenders" means those parties serving in the capacity as "Senior Term Lenders" under and as defined in the Existing Credit Agreement.

"Existing Subordinated Term Lenders" means those parties serving in the capacity as "Subordinated Term Lender" under and as defined in the Existing Credit Agreement.

"Expense Reimbursement" has the meaning given to it in Section 9.1(a).

"Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force and effect, as to which no appeal is pending and which has not been, and is not subject to being, reversed, stayed, modified or amended.

1378239_1
RLF1 3517630v 1

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"Governmental Authority" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority, or any court (including the Bankruptcy Court), tribunal, judicial or arbitral body, or any Self-Regulatory Organization.

"Hazardous Material" shall include, without regard to amount and/or concentration (a) any element, compound, or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substances, extremely hazardous substance or chemical, hazardous waste, medical waste, biohazardous or infectious waste, special waste, solid waste or terms of similar meaning under Environmental Laws; (b) petroleum, petroleum-based or petroleum-derived products; (c) polychlorinated biphenyls; (d) asbestos and asbestos-containing materials; (e) any substance exhibiting a hazardous waste characteristic including but not limited to corrosivity, ignitibility, toxicity or reactivity as well as any radioactive or explosive materials; and (f) any raw materials, building components, including but not limited to asbestos-containing materials and manufactured products containing Hazardous Materials.

"Indebtedness" means any liabilities or obligations, whether contingent or otherwise (including penalties, interest and premiums), including any of the following: (i) in respect of borrowed money or with respect to advances of any kind (including under any applicable credit line); (ii) evidenced by bonds, notes, debentures or similar instruments, (iii) for the payment of money relating to any capitalized lease obligation; (iv) for the deferred purchase price of goods or services or for trade or barter arrangements; (v) evidenced by a letter of credit or reimbursement obligation with respect to any letter of credit; (vi) under interest rate, currency or commodity hedging, swap or similar derivative transactions; (vii) all guarantees, assumptions, endorsements or other agreements and arrangements having the economic effect of a guarantee of any Person by the Sellers; and (viii) all liabilities and other obligations of others of the kind described in clauses (i) – (vii) that are secured by a Lien on any properties or assets of the Sellers.

"Intellectual Property" means all (i) foreign and domestic trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, Internet domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, and other indicia of origin, all applications and registrations for all of the foregoing, and all goodwill associated therewith and symbolized thereby, including without limitation all extensions, modifications and renewals of same (collectively, "Trademarks"); (ii) foreign and domestic inventions, discoveries and ideas, whether patentable or not, and all patents, registrations, and applications therefor, including without limitation divisions, continuations, continuations-in-part and renewal applications, and including without limitation renewals, extensions and reissues; (iii) confidential and proprietary information, trade secrets and know-how, including without limitation processes, schematics, databases, formulae, drawings, prototypes, models, designs and customer lists; (iv) foreign and domestic published and unpublished works of authorship, whether copyrightable or not (including, but not limited to, computer software), copyrights therein and thereto, and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof; (v) electronic data processing, information, recordkeeping, communications, telecommunications, networking, account management, inventory management and other such applications, software, and hardware, equipment and services (including, but not limited to, all applications and software installed on all hardware and equipment, and all databases, firmware, and related documentation), and Internet websites and related content (collectively, "IT Systems"); and (vi) all other intellectual property or proprietary rights and claims or causes of action arising out of or related to any infringement,

misappropriation or other violation of any of the foregoing, including without limitation rights to recover for past, present and future violations thereof. For the avoidance of doubt, the term "Intellectual Property" as used herein means all of the foregoing rights, whether registered or unregistered, and whether or not evidenced by any filings, including without limitation a Seller's rights to use the name "Ames," "Ames Taping Tools," "TapeTech" or "Axia" in any domestic or foreign jurisdiction.

"Intercompany Loans" means, with respect to each Seller, any intercompany Indebtedness between any such Seller and another Seller or Affiliates of another Seller, whether or not evidenced by promissory notes and/or recorded in the books and records of such Sellers.

"Interest" means all "interests" as such term is used in section 363(f) of the Bankruptcy Code.

"Inventory" means all inventory and all finished goods, merchandise, work in progress, residual by-products, samples, supplies, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to the Business and maintained, held or stored by or for any of the Sellers as of the Closing Date and any prepaid deposits for any of the same.

"IRS" means the Internal Revenue Service of the United States.

"Law" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or similar statute, law, common law, writ, injunction, decree, guideline, policy, ordinance, regulation, rule, code, Order, constitution, treaty, requirement, judgment or judicial or administrative doctrines enacted, promulgated, issued, enforced or entered by any Governmental Authority.

"Leased Real Property" means the leasehold interests of the Sellers or their Affiliates and the security deposits appurtenant thereto described in Section 3.9(b) of the Sellers' Disclosure Schedule, together with (a) any prepaid rent, security deposits and options to renew or purchase relating to the foregoing and (b) all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems and items of personal property of such Seller or its Affiliate used or useful in the Business attached or appurtenant thereto and all easements, rights of way, options, renewal rights, licenses, rights and appurtenances relating to the foregoing.

"Liabilities" means any and all debts, liabilities, obligations to perform services and other obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, known or unknown or determined or determinable, including those arising under any Law, Action or Order and those arising under any Contract.

"Licensed Intellectual Property" means all Intellectual Property used or useful in connection with the Business that any Seller is licensed or otherwise permitted by other Persons to use.

"Liens" means any mortgage, deed of trust, pledge, assignment, security interest, encumbrance, lien, Mechanics Lien, charge, hypothecation, deemed trust, Action, easement, charge or otherwise, or Claim or Interest of any kind or nature whatsoever in respect of any property, other than any license of Intellectual Property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Law in any other jurisdiction.

"Lien Taxes" means any Property Taxes for any Pre-Closing Period which if unpaid would result in the imposition of a Lien on any of the Purchased Assets.

"Loss" has the meaning given to it in Section 5.4.

"Material Adverse Effect" means any event, circumstance, development, change or effect that, individually or in the aggregate with all other events, circumstances, developments, changes or effects, (a) has had or would reasonably be expected to have or result in a material adverse effect or change in the results of operations, properties, assets, liabilities or condition (financial or otherwise) of the Business, the Purchased Assets or the Assumed Liabilities or (b) has or would reasonably be expected to prevent, materially delay or materially impair the ability of any Seller to consummate the Transactions, except, in each case, for any such effects resulting from or attributable to (i) general economic or political conditions; (ii) any condition arising solely by reason of the commencement of the Chapter 11 Cases; (iii) changes caused by acts of war, armed hostilities or terrorism occurring after the date hereof; and (iv) changes arising from the consummation of the Transactions or the announcement of the execution of this Agreement; provided, however, that the foregoing clauses (other than clause (ii)) shall not include, and thus the determination of "Material Adverse Effect" shall not exclude, any event, circumstance, development, change or effect that has a disproportionate effect on the Business, the Purchased Assets, the Assumed Liabilities or the Sellers as compared to the effect on other affected Persons.

"Material Contracts" has the meaning given to it in Section 3.12.

"Mechanics Liens" means mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of any of the Sellers, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation).

"New Senior Credit Facility" has the meaning given to it in Section 7.2(l).

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final, including, without limitation, any Order entered by the Bankruptcy Court in the Chapter 11 Cases (including, without limitation, the Sale Order).

"Owned Intellectual Property" means all Intellectual Property used or useful in connection with the Business that is owned by any Seller, directly or indirectly, jointly or individually.

"Owned Real Property" means the real property and interests therein described on Section 3.9(a) of the Sellers' Disclosure Schedule, that are owned by the Sellers or their Affiliates, including all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, and items of personal property attached or appurtenant thereto and all interests, easements, rights of way, licenses, rights, privileges, covenants, restrictive covenants, possibilities of reverter, options to purchase, hereditaments and other appurtenances relating to the foregoing.

"Permits and Licenses" has the meaning given to it in Section 2.1(a)(x).

"Permitted Encumbrances" means (a) statutory Liens for current Property Taxes not yet due or delinquent (or which may be paid without interest or penalties); (b) zoning, landmarking, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the occupancy or current use of the Purchased Assets; (c) all covenants, conditions, restrictions, easements, rights of way, licenses and other similar interests in land (excluding, for greater certainty, as of the Closing, any mortgages, assignments of rents or any other financial charges except those in the preceding clause (a)) which were recorded as of the Petition Date,

including any rights of way, easements, or other instruments granting similar rights that may be registered or recorded after such times without the consent of the Sellers and which do not materially interfere with the occupancy, value or current use of any such real property or any interests therein; and (d) matters which would be disclosed by an accurate survey or inspection of the real property which do not or could not materially impair the occupancy, value or current use of such real property which they encumber.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, joint venture, trust, Governmental Authority, unincorporated organization or other entity.

"Petition Date" means the date on which the Chapter 11 Cases are commenced by the filing of voluntary petitions under the Bankruptcy Code.

"Plan Alternative" means the plan of reorganization contemplated by Section 6 of the Restructuring Agreement.

"Pre-Closing Period" means any taxable period (or portion thereof) ending on or prior to the Closing Date.

"Prepetition Loan Obligations" means all indebtedness, obligations and liabilities of Sellers incurred prior to the Petition Date arising from or related to the Existing Credit Agreement, together with all fees, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date to the extent allowable under Section 506(b) of the Bankruptcy Code, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Property Taxes" means real and personal ad valorem property Taxes and any other Taxes imposed on a periodic basis and measured by the value of any item of property.

"Purchased Assets" has the meaning given to it in Section 2.1(a).

"Purchase Price" has the meaning given to it in Section 2.4.

"Purchaser" has the meaning given to it in the Preamble.

"Purchaser's Disclosure Schedule" means the Disclosure Schedule attached hereto as Exhibit D, dated as of the date hereof, delivered by the Purchaser to Sellers in connection with this Agreement.

"Purchaser's Knowledge" means the actual knowledge of the Purchaser, after having made reasonable inquiries.

"Receivables" means any and all accounts receivable, notes and other amounts receivable from third parties, including customers, arising from the conduct of the Business before the Closing, whether or not in the ordinary course of business, together with any unpaid financing charges accrued thereon.

"Registered" means, solely with respect to Intellectual Property, issued by, registered or filed with, renewed by or the subject of a pending application or registration before any Governmental Authority or Internet domain name registrar.

"Regulations" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Tax Code or other federal tax statutes.

"Related Party" has the meaning given to it in Section 3.24(a).

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other closed receptacles containing Hazardous Materials) into the indoor or outdoor environment.

"Remedial Action" means all actions taken to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (ii) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities or (iv) any other actions authorized or required by any Environmental Law or Governmental Authority.

"Representatives" means, with respect to a particular Person, any director or officer or other designated representative of such Person, including such Person's attorneys and financial advisors.

"Restructuring Agreement" means that certain Restructuring Agreement, dated December 4, 2009, by and among the Sellers, certain of the Existing Senior Term Lenders, certain of the Existing Subordinated Term Lenders, certain of the equity owners or proposed equity owners of Purchaser's direct parent entity, and certain other parties thereto.

"Sale Hearing" means the hearing in the Bankruptcy Court to consider and approve the Sale Order, as such hearing may be adjourned or continued from time to time.

"Sale Order" means the Order of the Bankruptcy Court approving the sale of the Purchased Assets to the Purchaser in form and substance acceptable to Required Signing Lenders (as defined in the Restructuring Agreement) and the Purchaser; in any event the Sale Order shall contain terms substantially similar to those set forth in Exhibit G[1]. Sellers shall use their commercially reasonable efforts to have included in the Sale Order authorization for the Sellers and the Purchaser to execute, deliver and/or file the Uniform Commercial Code termination statements, lien releases, discharges, financing change statements and such other documents, notes or instruments as the Purchaser may deem reasonably necessary or desirable to release all Liens (save and except for Permitted Encumbrances) on the Purchased Assets.

"SEC" means the United States Securities and Exchange Commission.

---

[1] The Sale Order should provide, *inter alia*, that (i) the Purchased Assets shall be transferred to the Purchaser free and clear of all Liens (other than Permitted Liens and Liens created by the Purchaser), (ii) the Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code, and (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions.

"Self-Regulatory Organization" means the New York Stock Exchange or any other securities exchange, futures exchange, contract market, any other exchange or corporation or similar self-regulatory body or organization applicable to a party to this Agreement.

"Sellers" has the meaning given to it in the Preamble.

"Sellers' Disclosure Schedule" means the Disclosure Schedule attached hereto as Exhibit E, dated as of the date hereof, delivered by the Sellers to the Purchaser in connection with this Agreement.

"Sellers' Knowledge" means the actual knowledge of the individuals listed on Section 1.1 to Sellers' Disclosure Schedule with respect to the applicable Seller, after having made reasonable inquiries of appropriate officers and employees of the respective Sellers.

"Straddle Period" means any taxable period beginning on or prior to and ending after the Closing Date.

"Subsidiary" means, when used with reference to any Person, any corporation, partnership, limited liability company, joint venture, stock company or other entity of which such Person (either acting alone or together with its other Subsidiaries), directly or indirectly, owns or has the power to vote or to exercise a controlling influence with respect to 50% of more of the capital stock or other voting interests, the holders of which are entitled to vote for the election of a majority of the board of directors or any similar governing body of such corporation, partnership, limited liability company, joint venture, stock company or other entity.

"TapeTech" has the meaning given to it in the introductory paragraph hereto.

"Tax" or "Taxes" means any and all taxes, assessments, charges, duties, fees, levies or other governmental charges (whether federal, state, local or foreign), including, without limitation, all federal, state, provincial, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding, escheat and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity.

"Tax Code" means the U.S. Internal Revenue Code of 1986, as amended through the date hereof.

"Tax Documents" has the meaning given to it in Section 5.10.

"Tax Returns" means any and all returns, reports, documents, forms, declarations, claims for refund or other information or filings required to be supplied to any Governmental Authority or jurisdiction (foreign or domestic) with respect to Taxes together with all schedules or attachments thereto, including, without limitation, information returns where required, any documents with respect to or accompanying payments of estimated Taxes, or any documents with respect to or accompanying requests for the extension of time in which to file any such report, return, document, declaration or other information, and including any amendments of any of the foregoing.

"Termination Date" means May 31, 2010.

"Trade Payables" means any and all trade payables of the Sellers to third parties arising from the conduct of the Business.

"Transactions" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"Transferred Employees" has the meaning given to it in Section 6.1.

"Transferred Intellectual Property" means all Owned Intellectual Property and all Licensed Intellectual Property.

Section 1.2        Interpretation and Rules of Construction.

In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)        when a reference is made in this Agreement to an Article, Section or Schedule, such reference is to an Article or Section of or Schedule to, this Agreement unless otherwise indicated;

(b)        the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)        whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)        the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)        all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)        the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)        references to a Person are also to the Person's heirs, executors, administrators, personal representatives, successors and permitted assigns, as applicable;

(h)        references to agreements are also to the same agreements as amended, restated or otherwise modified from time to time;

(i)        references to the Sellers are also to each Seller individually; and

(j)        the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

# ARTICLE II

## PURCHASE AND SALE

Section 2.1          Purchase and Sale of Assets.

In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)          Upon the terms and subject to the conditions of this Agreement, at the Closing, each Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to the Purchaser, and the Purchaser shall purchase and acquire from such Seller, all of such Seller's right, title and interest, as of the Closing Date, in and to any and all assets, properties, rights and claims of any kind or nature, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of any of the Sellers, whether now existing or hereinafter acquired, excluding only the Excluded Assets (such assets, properties, rights and claims to be acquired hereunder, collectively, the "Purchased Assets"), free and clear of all Liens (except for Permitted Encumbrances). The Purchased Assets shall include, but not be limited to, the following:

(i)          the Owned Real Property and the Leased Real Property that is the subject of an Assigned Contract;

(ii)          all tangible personal property related to, or used or useful in or held for use in the conduct of, the Business, including equipment, machinery, tools, supplies, spare parts, trucks, cars, other vehicles and rolling stock, furniture, fixtures, trade fixtures, leasehold improvements, office materials and supplies, and other tangible personal property located on, or off, the premises of the Owned Real Property and Leased Real Property;

(iii)          the Inventory (whether owned by, or on order to be delivered to, any Seller);

(iv)          all cash and cash equivalents, including cash in transit, securities (other than any equity interests in the Sellers) and negotiable instruments of the Sellers on hand, in lock boxes, in financial institutions or elsewhere, other than the Excluded Cash;

(v)          the Receivables;

(vi)          all files, operating data, books of account, general, financial and Tax (other than income tax) records, personnel records of the Transferred Employees, invoices, shipping records, supplier lists, price lists, vendor lists, mailing lists, catalogs, sales promotion literature, advertising materials, brochures, standard forms of documents, manuals of operations or business procedures, research materials, contracts, instruments, filings, administrative and pricing manuals, correspondence, memoranda, plats, architectural plans, surveys, title insurance policies, drawings, plans and specifications, environmental reports, maintenance or service records, soil tests, engineering reports, expired purchase orders, operating records, operating safety manuals, and other material and documents, records and files (whether or not in the possession of any of the Sellers or their respective Representatives, stored in hardcopy form or on magnetic, optical or other media) and any rights thereto owned, associated with or employed by any of the Sellers in the conduct of the Business or otherwise related to the Purchased Assets or the Assumed Liabilities;

(vii)     all goodwill and other intangible assets associated with the Business or the Purchased Assets, including rights under any confidentiality agreements executed by any third party for the benefit of any of the Sellers to the extent relating to the Business;

(viii)    the Transferred Intellectual Property;

(ix)     all of the rights and benefits accruing under any Assigned Contracts, including any outstanding deposits thereunder;

(x)     all of the rights and benefits accruing under any franchises, permits, consents, certificates, clearances, approvals, exceptions, variances, permissions, filings, publications, declarations, notices, licenses, agreements, waivers and authorizations, including Environmental Permits, of or with any Governmental Authority held, used or made by any of the Sellers in connection with the Business (collectively, the "Permits and Licenses") and all deposits and prepaid expenses held by third parties and/or governmental agencies, save and except any such Permit and License that is an Excluded Contract;

(xi)     the sales and promotional literature, customer lists and other sales-related materials related to the Business;

(xii)     the amount of, and all rights to any, insurance proceeds received by any of the Sellers after the date hereof in respect of the Loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or relating to any Assumed Liabilities;

(xiii)    all unexpired, transferable warranties, indemnities, or guaranties from any third party with respect to any Purchased Asset, including any item of real property, personal property or equipment;

(xiv)    to the extent transferable and to the extent related to the Purchased Assets, the full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and all security therefor received by any of the Sellers on the purchase or other acquisition of the Purchased Assets;

(xv)     any rights, claims, defenses, counterclaims, cross-claims or causes of action of Sellers, whether arising out of events occurring prior to, on or after the Closing Date, including (A) any rights under or pursuant to all warranties, representations and guarantees arising out of or relating to any of the Purchased Assets and (B) any causes of action against any current or former officer, director, employee, contractor or agent of any Seller or any Affiliate of any Seller (excluding any such causes of action that constitute commercial tort claims or Avoidance Claims);

(xvi)    any rights to Tax refunds, credits or similar benefits;

(xvii)   all deposits received by any of the Sellers from any subtenants with respect to any subleases of Leased Real Property;

(xviii)  all prepaid and deferred items that relate to the Business or the Purchased Assets, including all prepaid rentals and unbilled charges, fees and deposits;

(xix)    any deposits, refunds or unused retainers not otherwise specifically listed in this Section 2.1(a) that are related to the Sellers' Business or the Purchased Assets;

(xx)    all confidentiality, non-compete and similar agreements entered into by any of the Sellers, any of their respective officers, directors or employees or any of their respective representatives in connection with a sale of the Purchased Assets or the Business;

(xxi)    all current and prior insurance policies of any of the Sellers and all rights and benefits of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries; and

(xxii)    all other tangible and intangible assets, properties, rights and claims of any of the Sellers of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business or which relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described above.

(b)    Notwithstanding anything in Section 2.1(a) to the contrary, the Sellers shall not sell, convey, assign, transfer or deliver, nor cause to be sold, conveyed, assigned, transferred or delivered, to the Purchaser, and the Purchaser shall not purchase or acquire, and the Purchased Assets shall not include, the Sellers' right, title and interest in and to the following assets of the Sellers (collectively, the "Excluded Assets"):

(i)    the company seal, minute books, charter documents, stock or equity record books and such other similar books and records pertaining solely to the organization, existence or capitalization of the Sellers, as well as any other records or materials relating solely to the Sellers generally and not involving or related to the Purchased Assets, Assumed Liabilities or the operations of the Business;

(ii)    all rights of the Sellers under this Agreement and the Ancillary Agreements;

(iii)    without limitation of Section 2.1(a)(xvi), Tax Returns of the Sellers, other than those relating solely to the Purchased Assets, the Assumed Liabilities or the Business, except that income tax returns and documents and records related solely to such income tax returns (whether or not relating solely to the Purchased Assets, the Assumed Liabilities or the Business) shall be Excluded Assets;

(iv)    any Excluded Contract and rights thereunder;

(v)    any assets relating to the Employee Plans;

(vi)    any of the capital stock or equity interests in any of the Sellers;

(vii)    the Excluded Cash; and

(viii)    any right, property or asset that is listed or described in Section 2.1(b)(viii) of the Sellers' Disclosure Schedule. The Purchaser at its sole discretion shall be allowed to amend or supplement Section 2.1(b)(viii) of the Sellers' Disclosure Schedule at any time on or prior to the date that is ninety (90) days after the Closing Date (or such later time as Sellers and the Purchaser may agree or as set forth in the proviso in Section 2.6(a)) to add to the properties or assets to be excluded under this Section 2.1(b)(viii) without any adjustment to the Purchase Price.

Section 2.2          Assumption and Exclusion of Liabilities.

(a)     The Purchaser shall assume no liability or obligation of the Sellers except the liabilities and obligations expressly set forth in this Section 2.2(a) (collectively, the "Assumed Liabilities"), which the Purchaser or its assignee (as contemplated by Section 10.7) as the case may be, shall assume and pay, perform and discharge in accordance with their respective terms, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities or obligations are owed:

(i)     all Liabilities of the Sellers under the Assigned Contracts for the lease of real property (other than any such lease that is an Excluded Contract) and the other Assigned Contracts (other than any that is an Excluded Contract), in each case (A) for which all necessary consents and/or Bankruptcy Court approval to transfer have been obtained and (B) arising and relating solely to the period from and after the Closing and not arising out of any breach or default thereof or other activities prior to the Closing, and, with respect to the foregoing Assigned Contracts and subject to the proviso in Section 2.6(a), all Determined Cure Costs, it being understood and agreed that all such Determined Cure Costs shall be paid as a portion of the Purchase Price in accordance with Section 2.4(c);

(ii)     all Liabilities in respect of Permits and Licenses (other than any that is an Excluded Contract), in each case arising and relating solely to the period from and after the Closing and not to the extent arising out of any breach or default thereof or other activities prior to the Closing;

(iii)     (A) all Property Taxes and assessments on the Purchased Assets that relate to the period beginning after the Closing Date, and (B) all Lien Taxes; and

(iv)     all Designated Trade Payables.

(b)     Notwithstanding anything to the contrary in this Agreement, the parties expressly acknowledge and agree that the Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of any of the Sellers, or of any predecessor or Affiliate of any of the Sellers, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstance taking place prior to the Closing, other than the Assumed Liabilities. The Liabilities not specifically assumed by Purchaser pursuant to Section 2.2(a) shall be referred to herein collectively as the "Excluded Liabilities." Without limiting the foregoing, the Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims all of the Excluded Liabilities, including, without limitation, all of the following Liabilities, of any of the Sellers, or of any predecessor or Affiliate of any of the Sellers:

(i)     all Excluded Taxes;

(ii)     any Liabilities relating to or arising out of the Excluded Assets;

(iii)     all accounts payable, including Trade Payables (other than Designated Trade Payables);

(iv)     any Environmental Liabilities in respect of the Owned Real Property, the Leased Real Property and any area used pursuant to the Permits and Licenses relating to the Business, or Hazardous Material or environmental conditions that exist on or prior to the Closing Date;

1378239_1
RLF1 3517630v 1

(v)     the Sellers' obligations under this Agreement and the Ancillary Agreements and any fees or expenses incurred by any of the Sellers in connection with the negotiation, preparation, approval or execution of this Agreement and the Ancillary Agreements and/or the sale of the Purchased Assets pursuant hereto, including, without limitation, the fees and expenses of counsel, independent auditors, brokers, bankers, investment bankers and other advisors or consultants and any success (or similar fees) arising in connection therewith;

(vi)     any Liabilities arising as a result of any Action initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date (except to the extent that any such Liability is an Assumed Liability), including, without limitation, all Liabilities arising in connection with any Actions set forth on Section 2.2(b)(vi) of the Sellers' Disclosure Schedule;

(vii)     any Liabilities arising from or related to the Employee Plans or to the termination of any such Employee Plans, including without limitation any underfunding, withdrawal or termination Liabilities relating to any of the Seller's pension plans or health insurance plans;

(viii)     any Liability relating to the employment or termination of employment of any (x) Person arising from or related to the operation of the Business prior to Closing or the Transactions (including but not limited to, any severance or stay or incentive bonuses) or (y) Person who is not a Transferred Employee arising on or after the Closing, not expressly assumed by Purchaser under Article VI;

(ix)     any Liabilities arising under Intercompany Loans and all promissory notes related thereto;

(x)     all Liabilities arising under the Existing Credit Agreement;

(xi)     subject to Sections 2.2(a)(iii)(B) and (iv), any Liabilities arising from the ownership and operation of the Business prior to the Closing, including, without limitation, all Liabilities in respect of Indebtedness;

(xii)     any Liabilities arising from the operation of any successor liability Laws, including, without limitation, "bulk sales" statutes, to the extent that non-compliance therewith or the failure to obtain necessary clearances would subject the Purchaser or the Purchased Assets to the Claims of any creditors of any of the Sellers, or would subject any of the Purchased Assets to any Encumbrances or other restrictions (except for Permitted Encumbrances);

(xiii)     any Liabilities of any of the Sellers not related to the operation of the Business; and

(xiv)     any violation of an applicable Law or Order prior to the Closing by any of the Sellers, including, without limitation, any Environmental Law.

(c)     Nothing contained in this Agreement shall require the Purchaser to pay or discharge any Assumed Liabilities so long as the Purchaser shall in good faith contest the amount or validity thereof.

Section 2.3     Purchase of Purchased Assets.

On the terms and subject to the conditions of this Agreement, on the Closing Date (a) the Purchaser shall purchase the Purchased Assets from the Sellers, and (b) the Purchase Price shall be paid as set forth in Section 2.4.

Section 2.4        Purchase Price.

The purchase price (the "Purchase Price") payable in consideration for the sale, transfer, assignment, conveyance and delivery by the Sellers to the Purchaser of the Purchased Assets shall consist of the following:

(a)        $9,000,000, payable in the form of term notes issued ratably to certain of the Existing Senior Term Lenders (collectively, "Term Note A"); plus

(b)        $9,000,000, payable in the form of term notes issued ratably to certain of the Existing Senior Term Lenders (collectively, "Term Note B"); plus

(c)        21.5% of the total equity of the parent entity of Purchaser issuable pro rata to the holders of the Term Note B, as set forth on Section 2.4 of the Purchaser's Disclosure Schedule; plus

(d)        the assumption at the Closing by the Purchaser of the Assumed Liabilities from the Sellers; plus

(e)        an amount equal to the Determined Cure Costs payable by the Purchaser under Section 5.1(c), which shall be paid to the applicable counterparties of the applicable Assigned Contracts in accordance with Section 5.1(c).

Section 2.5        Allocation of the Purchase Price.

The Purchase Price (to the extent required by the Tax Code) shall be allocated among the Purchased Assets as of the Closing Date in accordance with the relative fair market value of the Purchased Assets at that time, to the extent relevant, and in a manner consistent with Section 1060 of the Tax Code and the Regulations, which allocation will be set out in a schedule to be determined and delivered by the Purchaser to the Sellers within sixty (60) days of the Closing Date (the "Allocation"). For all income Tax purposes and any other Tax purposes to the extent permitted by applicable law, the Purchaser and the Sellers agree that the Transactions shall be reported in a manner consistent with the terms of this Agreement, including the Allocation, and that none of them will take any position inconsistent therewith in any Tax Return or in any refund claim unless otherwise directed by a Governmental Authority. The Sellers and the Purchaser agree to cooperate with each other in preparing IRS Form 8594, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date. If such allocation is disputed by any taxation or other Governmental Authority, the Purchaser or any Seller receiving notice of such dispute will promptly notify the other party and the parties will use their reasonable commercial efforts to sustain the final allocation. The parties will share information and cooperate to the extent reasonably necessary to permit the Transactions to be properly, timely and consistently reported.

Section 2.6        Determined Cure Costs; Trade Payables Schedule.

(a)        The Purchaser agrees to satisfy all Determined Cure Costs, as and when such Determined Cure Costs become due, in respect of Assigned Contracts (other than Excluded Contracts) for which all necessary consents and/or Bankruptcy Court approval to transfer have been obtained; provided, however, that, notwithstanding anything to the contrary herein, if the Determined Cure Costs for any Assigned Contract exceeds the amount reflected in Section 2.6(a) of the Sellers' Disclosure Schedule (which Sellers shall update prior to the Closing to indicate the amount due and owing as of the Petition

Date for such Assigned Contracts), the Purchaser, in its sole discretion, may elect to make such Assigned Contract an Excluded Contract.

(b)     Prior to the Closing, Sellers shall provide the Purchaser with a schedule setting forth its Trade Payables outstanding as of 11:59:59 p.m. Eastern Standard Time on a date no earlier than three (3) Business Days prior to the Closing Date and shall update such schedule from time to time as reasonably requested by the Purchaser.

Section 2.7     Closing.

Subject to the terms and conditions of this Agreement, the consummation of the Transactions shall take place at a closing (the "Closing") to be held at the offices of Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603 at 10:00 a.m. Central time on the third Business Day following the satisfaction or waiver of the conditions to the obligations of the parties hereto set forth in Section 7.1 and Section 7.2 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions), or at such other place or at such other time or on such other date as Sellers and the Purchaser may mutually agree upon. The date of the Closing is herein referred to as the "Closing Date."

Section 2.8     Closing Deliveries by the Sellers.

At the Closing, the Sellers shall deliver or cause to be delivered to the Purchaser:

(a)     a certified copy of the Sale Order, as entered by the Bankruptcy Court;

(b)     the Bill of Sale and Assignment and Assumption Agreement, the Deeds applicable in the relevant jurisdictions for the Owned Real Property (with the Deeds for the Owned Real Property to be recorded with copies of all required Conveyance Tax stamps affixed, except for any Conveyance Taxes that are exempt pursuant to Section 1146(a) of the Bankruptcy Code), the Assignments of Intellectual Property and such other instruments, each in form and substance and in registrable or recordation form where applicable, reasonably satisfactory to the Purchaser, as may be reasonably requested by the Purchaser to effect the transfer of the Purchased Assets to the Purchaser, or to register or record or evidence such transfer on the public records, in each case duly executed by each applicable Seller and the other parties thereto (other than the Purchaser);

(c)     the Ancillary Agreements, duly executed by each applicable Seller and the other parties thereto (other than the Purchaser) other than the Ancillary Agreements delivered pursuant to Section 2.8(b);

(d)     a certificate of non-foreign status pursuant to section 1.1445-2(b)(2) of the Regulations from each Seller;

(e)     copies of resolutions of the board of directors of each Seller authorizing and approving the execution and delivery of this Agreement and the Ancillary Agreements and the performance by such Seller of its obligations hereunder and thereunder, certified by the Secretary of such Seller;

(f)     an incumbency certificate dated the Closing Date for each Seller executed by the Secretary of such Seller which shall identify the names and titles and bear the signatures of the officers of such Seller individually authorized to execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party;

(g)     copies of the certificate of incorporation and bylaws of each Seller, in each case certified by the Secretary of such Seller;

(h)     termination statements, lien releases, or other documents, notices or instruments as the Purchaser may reasonably deem necessary or desirable to release Liens (other than Permitted Encumbrances) on the Purchased Assets, each in form and substance reasonably satisfactory to the Purchaser duly executed by any holders of such Liens**[; provided that Sellers' inability to obtain third party termination statements, releases or other documents under this Section 2.8(h) shall not be considered a breach of this Agreement if good faith efforts to obtain such consents have made been prior to Closing]**;

(i)     written consents in form and substance reasonably satisfactory to the Purchaser duly executed by the applicable Sellers and counterparties evidencing any consents necessary to effect the assignment to the Purchaser of any Contracts set forth in <u>Section 7.2(g)</u> of the Sellers' Disclosure Schedule which are both (x) designated by the Purchaser as Assigned Contracts prior to the date that is **[five (5)]** Business Days before the Closing Date and (y) not fully assigned to Purchaser solely by virtue of the Sale Order, and the assignment to the Purchaser of Intellectual Property pursuant to <u>Sections 5.8(b)</u> and <u>5.8(c)</u>;

(j)     a certificate of a duly authorized officer of each of the Sellers certifying that all conditions set forth in <u>Section 7.2</u> have been satisfied (or to the extent any such condition has been waived in accordance with the terms hereof, attaching thereto the applicable written waiver);

(k)     physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(l)     any and all Tax clearance certificates or similar documents that may be required by any Governmental Authority in order to relieve Purchaser of (i) any obligation to withhold any portion of the Purchase Price, and (ii) any liability for Taxes of the Sellers for which relief is available by reason of a filing or receipt of an appropriate certificate;

(m)     certificates of title and title transfer documents to all titled motor vehicles, if applicable, that are included in the Purchased Assets;

(n)     releases by each of the Sellers of the Purchaser, Aurora Equity Partners III, L.P., each of the agents and lenders that is or was a party to credit facilities of Sellers existing prior to the Closing Date, each other equity owner of the Purchaser, and each of their respective affiliates, officers, directors, representatives, agents, counsel, consultants, successors and assigns; and

(o)     such other customary documents and instruments of transfer, assumptions and filings as may be reasonably required to be delivered by any Seller to consummate the Transactions or otherwise give effect to this Agreement.

Section 2.9     Closing Deliveries by the Purchaser.

At the Closing, the Purchaser shall deliver, or cause to be delivered to Sellers:

(a)     the Bill of Sale and Assignment and Assumption Agreement, and the Assignments of Intellectual Property, duly executed by the Purchaser;

(b)     the Ancillary Agreements to which the Purchaser is a party, duly executed by the Purchaser, other than the Ancillary Agreements delivered pursuant to <u>Section 2.9(a)</u>;

(c)     a certificate of a duly authorized officer of the Purchaser certifying as to the matters set forth in Section 7.1(a);

(d)     a copy of resolutions of the board of directors of the Purchaser authorizing and approving the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and the performance by the Purchaser of its obligations hereunder and thereunder, certified by the Secretary of the Purchaser;

(e)     an incumbency certificate dated the Closing Date for the Purchaser executed by the Secretary of the Purchaser which shall identify the names and titles and bear the signatures of the officers of the Purchaser individually authorized to execute and deliver this Agreement and the Ancillary Agreements to which the Purchaser is a party;

(f)     such other customary documents and instruments of transfer, assumptions and filings as may be reasonably required to be delivered by the Purchaser to consummate the Transactions or otherwise give effect to this Agreement; and

(g)     the Purchase Price in accordance with Section 2.4.

Section 2.10      Relinquishment of Control.

At the Closing, the Sellers shall turn over actual possession and control of all of the Purchased Assets to the Purchaser by taking such action that may be required or reasonably requested by the Purchaser to effect such transfer of possession and control.

Section 2.11      Assignment of Contracts and Rights.

(a)     To the extent that any Contract to be sold, transferred, conveyed or assigned (any sale, transfer, conveyance or assignment, a "Transfer") to the Purchaser pursuant to the terms of Section 2.1 is not capable of being Transferred to the Purchaser without the Consent of a third party, or if such Transfer or attempted Transfer would, or if the subsequent Transfer or attempted Transfer of the equity interests of the Purchaser would, constitute a breach thereof or a violation of any Law, nothing in this Agreement or in any document, agreement or instrument delivered pursuant to this Agreement will constitute a Transfer or an attempted Transfer thereof prior to the time at which all Consents necessary for such Transfer will have been obtained unless an Order of the Bankruptcy Court effects such Transfer without Consent.

(b)     Subject to Sections 7.2(g) and 7.2(h), to the extent that the Consents referred to in Section 2.11(a) are not obtained by the Closing with respect to any such Contracts to be Transferred, the Sellers will, from and after the Closing and until such Consents are obtained, use commercially reasonable efforts during the term of the affected Contract to (i) provide to the Purchaser or its Affiliate, as applicable, the benefits under any Contract referred to in Section 2.11(a), (ii) cooperate in any reasonable and lawful arrangement (including holding such Contracts in trust for the Purchaser or its Affiliate, as applicable, pending receipt of the required Consent) designed to provide such benefits to the Purchaser or its Affiliate, as applicable, and (iii) enforce for the account of the Purchaser or its Affiliate, as applicable, any rights of the applicable Sellers under the affected Contract (including the right to elect to terminate such Contract in accordance with the terms thereof upon the direction of the Purchaser). Subject to Sections 7.2(g) and 7.2(h), the Purchaser will, and, as applicable, will cause its Affiliates to, cooperate with the Sellers in order to enable the Sellers to provide to the Purchaser and any of its Affiliates that purchase any Purchased Assets hereunder the benefits contemplated by this Section 2.11(b). Subject to Sections 7.2(g) and 7.2(h), the Purchaser will pay any amount it would have been

required to pay under any such Contract had the Contract been assigned (after obtaining the requisite Consent) to the Purchaser or its Affiliate, as applicable, at the Closing.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## OF THE SELLERS

Except as set forth in the corresponding sections or subsections of the Sellers' Disclosure Schedule, the Sellers jointly and severally hereby represent and warrant to the Purchaser as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as to the matters set forth below.

Section 3.1        Organization, Authority and Qualification of the Sellers.

Each of the Sellers is a corporation duly incorporated, validly existing and, except as a result of the commencement of the Chapter 11 Cases, in good standing under the laws of the jurisdiction of its incorporation, and, subject to obtaining the approval of the Bankruptcy Court, has all necessary power and authority to enter into this Agreement and the Ancillary Agreements, to carry out its obligations hereunder and thereunder, and to consummate the Transactions. Each of the Sellers has all necessary power and authority to own, lease, operate and conduct its respective businesses, properties and assets as now being conducted. Each of the Sellers is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its respective business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified, or in good standing (a) has resulted from the commencement or continuance of the Chapter 11 Cases; or (b) would not: (i) adversely affect the ability of such Seller to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions; or (ii) otherwise reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Subject to obtaining the Sale Order from the Bankruptcy Court, the execution and delivery of this Agreement and the Ancillary Agreements by each Seller, the performance by each Seller of its obligations hereunder and thereunder, and the consummation by each Seller of the Transactions have been duly authorized by all requisite action on the part of such Seller and their stockholders, and no other corporate action or proceeding on the part of any of the Sellers is necessary to authorize the execution and delivery of this Agreement and the Ancillary Agreements by each of the Sellers, or the consummation of the Transactions. This Agreement has been, and upon their execution, the Ancillary Agreements shall have been, duly executed and delivered by each Seller, and (assuming due authorization, execution and delivery by the Purchaser), subject to the approval of the Bankruptcy Court, this Agreement constitutes, and, upon their execution, the Ancillary Agreements shall constitute, legal, valid and binding obligations of such Seller, as applicable, enforceable against such Seller in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity. None of the Sellers have any Subsidiaries, except for (i) other Sellers or (ii) the Canadian Entity.

Section 3.2        No Conflict.

Subject to the approval of the Bankruptcy Court, and assuming that all consents, approvals, authorizations and other actions described in Section 3.3 have been obtained, all filings and notifications listed in Section 3.3 of the Sellers' Disclosure Schedule have been made, and the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Sellers and the consummation of the Transactions hereby and thereby do not and will not, except as set forth in Section 3.2 of the Sellers' Disclosure Schedule: (a) violate, conflict with or result in the breach of the certificate of incorporation, articles of incorporation, bylaws, or similar organizational documents of any of the

Sellers; (b) conflict with or violate any Law or Order applicable to any of the Sellers or any of the Purchased Assets or Assumed Liabilities; (c) violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which any of the Sellers is a party, or result in the creation of any Lien on any of the Purchased Assets, except to the extent that any such rights of termination, amendment, acceleration, suspension, revocation or cancellation and such Liens are not enforceable (before or after consummation of the Transactions) due to operation of the Bankruptcy Code.

Section 3.3    Governmental Consents and Approvals.

The execution, delivery and performance of this Agreement and each Ancillary Agreement by the Sellers do not or, upon the entry by the Bankruptcy Court of the Sale Order as required by Section 7.1(d) and Section 7.2(d), will not require any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or any other Person under any of the terms, conditions or provisions of any Law or Order applicable to any Seller or by which any of the Purchased Assets may be bound, any Contract to which any Seller is a party or by which any Seller may be bound, except as described in Section 3.3 of the Sellers' Disclosure Schedule.

Section 3.4    SEC Filings; Financial Statements; Undisclosed Liabilities.

(a)    None of the Sellers is required (or has been required in the past) to file any forms, reports or other documents with the SEC.

(b)    Each of the financial statements delivered to Purchaser has (i) been prepared from, and is in accordance with, the books and records of Sellers, and complies in all material respects with applicable accounting requirements, (ii) been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and fairly presents in all material respects the consolidated financial position and the consolidated results of operations and cash flows of the Sellers as at the dates and for the periods covered thereby except that the unaudited interim financial statements were or are subject to normal and recurring year-end adjustments which were not or are not expected to be material in amount.

(c)    Neither the Sellers have any Indebtedness or other Liabilities of any nature relating to any of the Purchased Assets or Assumed Liabilities, whether known or unknown, absolute, accrued, contingent or otherwise and whether due or to become due which would be required by GAAP to be disclosed in the consolidated financial statements, except (i) those disclosed or specifically reserved against on the most recent balance sheet of the Sellers included in unaudited financial statements, (ii) those incurred since [_____, 2009] in the ordinary course of business consistent with past practice, or (iii) those set forth in Section 3.4(c) of the Sellers' Disclosure Schedule.

Section 3.5    Litigation.

Except (a) for the Chapter 11 Cases or (b) as set forth in Section 3.5 of the Sellers' Disclosure Schedule, there is no pending Action by or against any of the Sellers or relating to the Business or any of the Purchased Assets or Assumed Liabilities, or, to the Sellers' Knowledge, threatened against or affecting any of the Sellers or relating to the Business or any of the Purchased Assets or Assumed Liabilities, which, if adversely determined, would reasonably be expected to result in Liability in excess of $100,000.

Section 3.6        Compliance with Laws.

Except as set forth in Section 3.6 of the Sellers' Disclosure Schedule, the Sellers (a) have conducted and continue to conduct the Business in all material respects in accordance with all applicable Laws and Orders applicable to the Business, (b) have complied with and continue to comply with in all material respects all Laws and Orders applicable to the Purchased Assets and the Assumed Liabilities, (c) are not in violation in any material respect of any such Law or Order, and (d) have not received any notice that any violation of any such Law or Order is being or may be alleged.

Section 3.7        Environmental Matters.

Except as set forth in Section 3.7 of the Sellers' Disclosure Schedule:

(a)        The Business, the Leased Real Property, the Owned Real Property or any properties or facilities owned, leased or operated by the Business are in compliance with Environmental Laws;

(b)        The Business possesses and is in compliance with all Environmental Permits necessary for the conduct of its business as presently conducted;

(c)        No Environmental Claims have been asserted against the Business or, to the Sellers' Knowledge, any predecessor in interest, nor do the Sellers have knowledge or notice of any threatened or pending Environmental Claim against the Business or any predecessor in interest;

(d)        Neither the Business, the Leased Real Property, the Owned Real Property nor any properties or facilities currently or formerly owned, leased, operated or otherwise used by the Business or, to the Sellers' Knowledge, a predecessor in interest is subject to any agreement that may require it to pay to, reimburse, guarantee, pledge, defend, indemnify or hold harmless any Person for or against any Environmental Liabilities; and

(e)        No facts, circumstances or conditions exist with respect to the Business, the Leased Real Property, the Owned Real Property, any properties or facilities currently or formerly owned, leased, operated or otherwise used by the Business or, to the Sellers' Knowledge, a predecessor in interest that could reasonably be expected to result in an Environmental Claim or Environmental Liabilities.

Section 3.8        Intellectual Property.

(a)        Schedule 3.8(a) sets forth a true and complete list of all (i) Owned Intellectual Property; and (ii) Licensed Intellectual Property.

(b)        None of the Sellers are violating and have not violated any Intellectual Property rights. There are no Actions, reissues, reexaminations, public protests, interferences, arbitrations, mediations, oppositions, cancellations, Internet domain name dispute resolutions or other proceedings (collectively, "Suits") pending, decided, threatened or asserted concerning any Claim or position that any Seller or any of their indemnitees have violated any Intellectual Property rights of others.

(c)        There are no Suits pending, decided, threatened or asserted concerning the Owned Intellectual Property. To the Sellers' Knowledge, there are no Suits pending, decided, threatened or asserted concerning the Licensed Intellectual Property or the right of any Seller to use the Licensed Intellectual Property.

(d)     No Person other than a Seller has any ownership interest in, or a right to receive a royalty or similar payment with respect to, any of the Owned Intellectual Property. No Person is entitled to a royalty or similar payment with respect to Intellectual Property not owned by a Seller. None of the Sellers have granted any options, licenses, assignments or agreements of any kind relating to (i) ownership of rights in Owned Intellectual Property; or (ii) the marketing or distribution of Owned Intellectual Property.

(e)     Except as set forth in Section 3.8(e) to the Sellers' Disclosure Schedule, all registration and application fees necessary to maintain the Owned Intellectual Property have been paid, all necessary renewal applications have been filed and all other steps necessary for maintenance have been taken.

(f)     The Sellers are using the trademark "Ames" in Canada, and the Canadian Entity has been using the trademark "Ames" in Canada solely with the authorization of the Sellers.

Section 3.9     Real Property.

(a)     Section 3.9(a) of the Sellers' Disclosure Schedule lists the street address, legal description where appropriate and the current owner of each parcel of real property in which any of the Sellers has fee title (or equivalent) interest and which is used or useful in or held for use in the conduct of the Business. Except as described in Section 3.9(a) of the Sellers' Disclosure Schedule: (i) each Seller listed in Section 3.9(a) of the Sellers' Disclosure Schedule as the owner of a parcel of Owned Real Property has good marketable title in fee simple to such parcel; (ii) to the extent as are in any of the Sellers' possession, the Sellers have made available to the Purchaser copies of each deed for each parcel of Owned Real Property; and (iii) all buildings and other improvements situated on the Owned Real Property form a part of the Owned Real Property and are owned by the Sellers. No Seller has received notice of any pending condemnation proceeding or any threatened condemnation that would preclude or impair the use of any Owned Real Property by the Business for the purposes for which it is currently used.

(b)     Section 3.9(b) of the Sellers' Disclosure Schedule lists the street address of each parcel of real property leased or subleased by any Seller as tenant or subtenant, as the case may be, which is used or useful in or held for use in the conduct of the Business, and the identity of the lessee of each such parcel of Leased Real Property. The Sellers have made available to the Purchaser true and complete copies of the leases and subleases in effect at the date hereof (including all amendments thereto and assignments in respect thereof) relating to the Leased Real Property, and there has not been any sublease or assignment entered into by any of the Sellers in respect of the leases and subleases relating to the Leased Real Property. Each lease and sublease in respect of the Leased Real Property is a valid lease or sublease and Sellers have received no written notice of default except as disclosed in Section 3.9(b) of the Sellers' Disclosure Schedule. The security deposit required pursuant to each lease and sublease in respect of the Leased Real Property has not been drawn upon by the relevant landlord or sublandlord, as applicable, and no additional monies are required to bring the security deposits into compliance with respect to each such lease or sublease, as applicable. No Seller has received notice of any pending condemnation proceeding or any threatened condemnation that would preclude or impair the use of any Leased Real Property by the Business for the purposes for which it is currently used. No Seller has received notice of the applicable Governmental Authority altering its zoning Laws so as to affect or potentially affect the Leased Real Property.

(c)     Except as set forth in Section 3.9(c) of the Sellers' Disclosure Schedule, Sellers have (i) in the case of Owned Real Property, good, valid and marketable title to, and (ii) in the case of the Leased Real Property, valid and binding leasehold interests in all of their respective material assets, free and clear of any Liens, except, in each case, for Permitted Encumbrances. No options or rights of first

offer or rights of first refusal or similar rights or options have been granted by any Seller to any Person (other than the Purchaser) that are enforceable after the entry by the Bankruptcy Court of the Sale Order to purchase, lease or otherwise acquire any interest in any of the Owned Real Property or leases or subleases relating to the Leased Real Property.

(d)     With respect to the Owned Real Property, the operation thereof conforms to the requirements of all restrictive covenants or other encumbrances affecting all or part of the Owned Real Property, and to all applicable laws, regulations, codes, orders, ordinances, rules and statutes, including without limitation Local Law 5 of 1973, as amended, Local Law 10 of 1980, as amended, and those relating to environmental protection, conservation, architectural barriers to the handicapped, zoning and building.

(e)     With respect to the Owned Real Property, there are no actual or pending and, to the best of Seller's Knowledge, no threatened, suits, actions, investigations or proceedings with respect to all or part of the Owned Real Property which could result in a lien on or lis pendens affecting all or part of the Owned Real Property.

(f)     All utilities that are required for the full and complete occupancy and use of the Owned Real Property have been connected to and are currently serving the Owned Real Property.

(g)     Seller is in possession of all certificates of occupancy required with respect to the Owned Real Property.

Section 3.10     Employee Benefit Matters.

(a)     Section 3.10(a) of the Sellers' Disclosure Schedule lists all Employee Plans. Each Employee Plan is in writing, and the Sellers have made available to the Purchaser a true and complete copy of each Employee Plan and all amendments made to such plans together with, as applicable, any applicable collective bargaining agreements and ancillary agreements, all current funding agreements, the most recent determination letter, if applicable, all current summary descriptions, and, if applicable, the Form 5500 and attached schedules, actuarial report and financial statements relating to those Employee Plans for the most recent two years. No facts, conditions or circumstances have occurred between the date of the foregoing documents that were delivered or made available to the Purchaser and the date of this Agreement that would materially affect the information contained in those documents and, in particular, and without limiting the generality of the foregoing, no oral or written promises or commitments have been made to amend any Employee Plan or to provide increased benefits under any Employee Plan to any of the Business Employees, except as required by applicable Laws.

(b)     Except as set forth in Section 3.10(b) of the Sellers' Disclosure Schedule, each Employee Plan has been operated in all material respects in accordance with its terms and the requirements of all applicable Laws (including, without limitation, all Tax rules with which compliance is required for any intended favorable Tax treatment). Each of the Sellers has performed all material obligations required to be performed by it in respect of the Business Employees prior to Closing under, is not in any material respect in default under or in material violation of, any Employee Plan. There is no material default or violation of an Employee Plan by any party thereto and no action is pending or, to the Sellers' Knowledge, threatened with respect to any Employee Plan and, to the Sellers' Knowledge, no fact or event exists that could give rise to any such Action.

(c)     None of the Employee Plans are "multiemployer plans" as defined in Section 3(37) of ERISA, or "defined benefit plans" as defined in Section 3(37) of ERISA.

(d)     Neither the Seller nor any ERISA Affiliates provide, nor have they at any time provided coverage under any welfare benefit plan (as defined under Section (3)1 of ERISA) to any of their retirees, other than any continuation or conversion coverage which any such retiree many have purchased at his or her own expense.

Section 3.11     Taxes

Except as set forth in <u>Section 3.11</u> of the Sellers' Disclosure Schedule,

(a)     Sellers have timely filed or caused to be timely filed or will timely file or cause to be timely filed with the appropriate Governmental Authorities (taking into account extensions to file Tax Returns) all Tax Returns that are required to be filed with respect to the income or operations of the Business or the ownership of the Purchased Assets on or prior to the Closing Date;

(b)     All Taxes whether or not shown to be payable on such Tax Returns have been paid or will be timely paid and all Taxes due by or with respect to the income or operations of the Business or the ownership of the Purchased Assets for the Pre-Closing Period have been timely paid or will be timely paid in full on or prior to the Closing Date;

(c)     (i) None of the Sellers are the subject of an audit or other examination of Taxes by any Governmental Authorities with respect to the income or operations of the Business or the ownership of the Purchased Assets; (ii) to the Sellers' Knowledge, no such audit or examination is threatened or pending; and (iii) the Sellers have not received any written notices from any Governmental Authority relating to any issue that could result in any liability for Taxes with respect to the income or operations of the Business or the ownership of the Purchased Assets;

(d)     The Sellers have not entered into an agreement or waiver extending any statute of limitations relating to the payment or collection of Taxes with respect to the income or operations of the Business or the ownership of the Purchased Assets that has not expired;

(e)     There are no Liens for Taxes or security interests on any of the Purchased Assets (other than for Taxes not yet due); and

(f)     None of the Purchased Assets is "tax-exempt use property" or tax-exempt bond financed property within the meaning of Section 168(g) of the Tax Code;

(g)     None of the Purchased Assets is property that the Purchaser will be required to treat as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately before the enactment of the Tax Reform Act of 1986;

(h)     None of the Purchased Assets is subject to a lease other than a "true" lease for federal income tax purposes; and

(i)     No written claim has been made by any Governmental Authority in a jurisdiction where neither the Company nor any of its Subsidiaries files a Tax Return that the Company or any of its Subsidiaries is or may be subject to Tax in that jurisdiction.

Section 3.12    Material Contracts

(a)    Section 3.12(a) of the Sellers' Disclosure Schedule sets forth all Contracts concerning the Purchased Assets, the Transferred Intellectual Property or that are related to, or used or useful in or held for use in, the Business (except in the case of clauses (i), (iii), (iv), (vi)-(xi) and (xiii) below, Contracts (other than Contracts concerning the Transferred Intellectual Property) that individually have a future liability not in excess of $50,000 annually or $100,000 during the term thereof and that are cancelable by a Seller upon notice of not more than 30 calendar days without penalty or cost), including, without limitation (such Contracts collectively, "Material Contracts", and each a "Material Contract"):

(i)    Contracts for the purchase or sale of assets, products or services;

(ii)    Sole source supply Contracts for the purchase of Inventory or other goods or services that are otherwise not generally available and that are used or useful in connection with the Business;

(iii)    Contracts pursuant to which a Seller grants to any Person the right to manufacture, design, market, distribute or resell any Business product, or to represent a Seller with respect to any such product, or act as agent for any Seller in connection with the marketing, distribution or sale of any Business product;

(iv)    Contracts for the lease of (A) real property or (B) tangible personal property;

(v)    Contracts containing a covenant that restricts a Seller or any Affiliate of a Seller from engaging in any line of business or competing with any Person;

(vi)    Contracts providing for indemnification by a Seller, other than in connection with respect to standard terms and conditions of a Contract for the purchase or sale of assets, products or services in the ordinary course of business;

(vii)    Employment, consulting or independent contractor Contracts, other than unwritten at-will employment Contracts;

(viii)    Contracts relating to a joint venture of the Business;

(ix)    Currency exchange, interest rate, commodity exchange or similar Contracts;

(x)    Contracts for capital expenditures;

(xi)    Contracts with any director, officer or employee of any of the Sellers (in each case, other than (A) employment agreements covered in clause (vii) above), (B) payments of compensation for employment to employees in connection with unwritten at-will employment Contracts and (C) participation in Employee Plans by employees);

(xii)    Contracts or licenses of any patents, trademarks, trade names, service marks, copyrights or other Intellectual Property received from or granted to third parties; and

(xiii)    Contracts not made in the ordinary course of business.

(b)    The Sellers have made available to the Purchaser true and complete copies of the Material Contracts (including all amendments thereto and assignments thereof). Except as set forth in

<u>Section 3.12(b)</u> of the Sellers' Disclosure Schedule, each Material Contract (i) is valid and binding on the applicable Seller and, to the Sellers' Knowledge, the counterparties thereto, and is in full force and effect; and (ii) upon consummation of the Transactions, except to the extent that any consents set forth in <u>Section 3.3</u> of the Sellers' Disclosure Schedule and Bankruptcy Court approvals to transfer are not obtained, shall continue in full force and effect without penalty or other adverse consequence. Except as disclosed in <u>Section 3.12(b)</u> of the Sellers' Disclosure Schedule, the applicable Seller and, to the Sellers' Knowledge, the counterparties thereto, are not in breach of, or default under, any Material Contract to which any of them is a party (except for nonpayment of amounts accurately described on <u>Schedule 2.6(a)</u>).

Section 3.13        <u>Brokers</u>.

No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of any Seller. The Sellers are solely responsible for the fees and expenses of any financial advisor to the Sellers.

Section 3.14        <u>Title to Purchased Assets</u>.

(a)        The Sellers have good and valid title to, or in the case of leased assets, a valid leasehold interest in, all of the Purchased Assets and, subject to the entry of the Sale Order, Purchaser will be vested with good and marketable title to such Purchased Assets, free and clear of all Liens, other than Permitted Liens, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. Prior to the Closing, if and as so requested by the Purchaser, the Canadian Entity shall have conveyed and transferred in accordance with Section 5.2(a), free and clear of Liens, all of its assets or particular assets designated by Purchaser to one or more of the Sellers, so that such assets are included in the Purchased Assets as of the Closing; provided that Purchaser shall pay an additional amount to the Canadian Entity for the value of the assets of the Canadian Entity so transferred.

Section 3.15        <u>Insurance</u>.

Set forth in <u>Section 3.15</u> of the Sellers' Disclosure Schedule is an accurate and complete list of each insurance policy and insurance arrangement that covers businesses, properties, assets (including the Purchased Assets), Liabilities (including the Assumed Liabilities) or employees (including self insurance, but excluding insurance policies providing benefits under welfare plans and directors' and officers' insurance) of the Business (the "<u>Insurance Policies</u>"). The Insurance Policies are in full force and effect for such amounts as are sufficient for requirements of Law and all Material Contracts to which a Seller or any of its respective Subsidiaries is a party or by which it is bound, all premiums thereon have been paid, and the Sellers are otherwise in compliance in all material respects with the terms and provisions of such policies. No Seller is in default under any of the Insurance Policies (or any policy required to be set forth in <u>Section 3.15</u> of the Sellers' Disclosure Schedule) and there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default thereunder. No Seller has received any notice of cancellation or non-renewal of any such Insurance Policies nor has the termination of any such Insurance Policies been threatened, and there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such Insurance Policies.

Section 3.16        <u>Suppliers and Customers</u>.

<u>Section 3.16</u> of the Sellers' Disclosure Schedule sets forth the **[ten (10)]** largest customers of the Business based on total revenues of the Business since January 1, 2008, and the **[ten (10)]** largest suppliers of the Business based on consolidated purchases by the Business during such period. Except as

set forth in <u>Section 3.16</u> of the Disclosure Schedule, no Seller has received any notice that any such supplier or customer has cancelled its relationship with any Seller or the Business or intends to significantly reduce the amounts sold to or bought from, as applicable, any Seller.

Section 3.17     <u>Permits</u>

The Sellers have made available to the Purchaser prior to the date hereof a true and complete copy of each of the Permits and Licenses, each of which is listed in <u>Section 3.17</u> of the Sellers' Disclosure Schedule. The Sellers have obtained and possess all Permits and Licenses and have made all registrations or filings with or notices to any Governmental Authority necessary for the lawful conduct of the Business as presently conducted and operated, or necessary for the lawful ownership of their properties and assets or the operation of the Business as presently conducted and operated. Each such Permit and License is included in the Purchased Assets. No proceeding to modify, suspend, revoke, withdraw, terminate or otherwise limit any such Permit and License is pending or threatened.

Section 3.18     <u>Absence of Certain Changes</u>.

Since January 1, 2009, other than as a result of the commencement of the Chapter 11 Cases, there has not been, occurred or arisen any agreement, condition, action, omission or event which would be prohibited (or require consent) under <u>Section 5.2</u> had it existed, occurred or arisen after the date of this Agreement.

Section 3.19     <u>Labor Matters</u>.

(a)     Except as set forth in <u>Section 3.19</u> of the Sellers' Disclosure Schedule, (i) none of the Sellers are a party to any collective bargaining, voluntary recognition, union or similar agreement with respect to any of the Business Employees, and to the Sellers' Knowledge, no union represents or claims to represent or is attempting to organize any of the Business Employees and the Sellers are not aware of any existing certification where no collective bargaining agreement exists, (ii) there is no unfair labor practice charge or complaint against the Sellers in respect of the Business pending or threatened before the National Labor Relations Board, any federal or state labor relations board or any court or tribunal, and (iii) there is no strike, lockout, dispute, request for representation, slowdown or stoppage pending or threatened in respect of the Business and there has been no strike, lockout, dispute, request for representation, slowdown or stoppage within the past three (3) years in respect of the Business. Except as set forth in <u>Section 3.19</u> of the Sellers' Disclosure Schedule, there are no pending, or to the Sellers' Knowledge, threatened actions, grievances, arbitrations, administrative proceedings, charges, complaints or investigations that involve the collective bargaining agreements or labor or employment relations of the Business, including but not limited to, issues relating to employment discrimination, wages and hours and occupational health and safety. Except as disclosed in <u>Section 3.19</u> of the Sellers' Disclosure Schedule, there are no outstanding Orders against any of the Sellers under any applicable Law relating to occupational safety and health, or any other matters relating to employment or employees, in connection with the Business.

(b)     No key employee or group of employees has informed the Sellers, either orally or in writing, of any plans to terminate their employment with the Sellers generally or as a result of the transactions contemplated hereby or otherwise.

(c)     All persons employed by the Sellers are employees at will or otherwise employed such that the Sellers may lawfully terminate their employment at any time, with or without cause, without creating any material cause of action against the Sellers or otherwise giving rise to any material liability of the Sellers for wrongful discharge, breach of contract or tort or any other similar cause at law or in equity.

(d)     Except as set forth in <u>Section 3.19</u> of the Sellers' Disclosure Schedule, the Sellers have complied in all material respects with all applicable Laws, rules and regulations relating to labor, labor relations or employment, including, without limitation, any provisions thereof relating to equal employment opportunity, wages, hours, overtime regulation, employee safety, immigration control, drug testing, termination pay, vacation pay, fringe benefits, collective bargaining and the payment and/or accrual of the same.

(e)     Each person whom the Sellers have retained as an independent contractor qualifies or qualified as an independent contractor and not as an employee of the Sellers under the Tax Code and all applicable state laws.

(f)     No charge or complaint of employment discrimination or other similar charge or complaint has been made against Sellers during the last three (3) years, or is pending or, to the Sellers' Knowledge, threatened.

Section 3.20     <u>Inventory</u>.

Except as set forth on <u>Section 3.20</u> of the Sellers' Disclosure Schedule, all Inventory of the Sellers is of good merchantable quality, and readily saleable (in the case of Inventory held for sale) or currently usable (in the case of other Inventory) in the ordinary course of business. The value of obsolete, damaged or excess Inventory and of Inventory below standard quality has been written down on the most recent balance sheet or, with respect to Inventory purchased since such balance sheet date, on the books and records of the Sellers, to ascertainable market value.

Section 3.21     <u>Receivables</u>.

The Receivables, (i) except for intercompany claims, have arisen out of actual sales with unaffiliated third parties in the ordinary course of business consistent with past practice, (ii) are free and clear of all defenses and claims of any nature whatsoever other than claims for warranties and claims made in the ordinary course of business that are not material in the aggregate, and (iii) are collectible in the ordinary course of business consistent with past practice, net of reserves.

Section 3.22     <u>Transactions with Related Parties</u>.

Except as set forth in <u>Section 3.22</u> of the Sellers' Disclosure Schedule:

(a)     Except for employment or compensation arrangements listed on <u>Schedule 3.12(a)</u>, no agreement or transaction between any of the Sellers and (i) any director, officer, stockholder or Affiliate of the Sellers, or (ii) any relative or spouse (or relative of such spouse) of any such director, officer, stockholder or Affiliate (such persons in (i) and (ii) being referred to herein as a "<u>Related Party</u>" or collectively as the "<u>Related Parties</u>") has been entered into.

(b)     No Related Party is a director or officer of, or has any direct or indirect interest in (other than the ownership of not more than 5% of the publicly traded shares of), any Person or entity which is a supplier, vendor, or competitor of any of the Sellers.

(c)     No Related Party owns or has any interest in, directly or indirectly, in whole or in part, any tangible or intangible property used or useful in the conduct of the Business or any Purchased Asset.

(d)     No Seller has made any loans, payments or transfers of any Seller's assets to any Related Party.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES
## OF THE PURCHASER

Except as set forth in the corresponding sections or subsections of the Purchaser's Disclosure Schedule, the Purchaser hereby represents and warrants to the Sellers as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

Section 4.1      Organization and Authority of the Purchaser.

The Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware and has all necessary corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the Transactions. The Purchaser is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not adversely affect the ability of the Purchaser to carry out its obligations under this Agreement and the Ancillary Agreements to which it is a party, and to consummate the Transactions. The execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements to which it is a party, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation by the Purchaser of the Transactions have been duly authorized by all requisite company action on the part of the Purchaser. This Agreement has been, and upon their execution the Ancillary Agreements to which the Purchaser is a party shall have been, duly executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by each of the Sellers and other parties thereto), subject to the approval of the Bankruptcy Court, this Agreement constitutes, and upon their execution the Ancillary Agreements to which the Purchaser is a party shall constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

Section 4.2      No Conflict.

Subject to obtaining the approval of the Bankruptcy Court, and assuming that all consents, approvals, authorizations and other actions described in Section 4.3 have been obtained, all filings and notifications listed in Section 4.3 of the Purchaser's Disclosure Schedule have been made, and except as may result from any facts or circumstances relating solely to the Sellers, the execution, delivery and performance by the Purchaser of this Agreement and the Ancillary Agreements to which the Purchaser is a party do not and will not: (a) violate, conflict with or result in the breach of any provision of the certificate of incorporation or bylaws of the Purchaser; (b) conflict with or violate any Law or Order applicable to the Purchaser or its assets, properties or businesses; or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Purchaser is a party, except, in the case of clauses (b) and (c), as would not materially and adversely affect the ability of the Purchaser to carry out its obligations under this Agreement and the Ancillary Agreements to which it is a party, and to consummate the Transactions.

Section 4.3        Governmental Consents and Approvals.

The execution, delivery and performance by the Purchaser of this Agreement and each Ancillary Agreement to which the Purchaser is a party do not or, upon the entry by the Bankruptcy Court of the Sale Order as required by Section 7.1(d) and 7.2(d), will not require any consent, approval, authorization or other Order of, action by, filing with, or notification to, any Governmental Authority, except (i) as described in Section 4.3 of the Purchaser's Disclosure Schedule and (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by the Purchaser of the Transactions.

Section 4.4        Litigation.

As of the date hereof, no Action by or against the Purchaser is pending or, to the Purchaser's Knowledge, threatened, which would reasonably be expected to affect the legality, validity or enforceability of this Agreement, any Ancillary Agreement or the consummation of the Transactions.

Section 4.5        Brokers and Finders.

No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Purchaser.

## ARTICLE V

## ADDITIONAL AGREEMENTS

Section 5.1        Assumption of Assigned Contracts.

(a)        Purchaser shall have thirty (30) days after the Closing Date (the "Executory Contract Option Period") to designate in writing to Sellers any Contract as an Assigned Contract. Each Seller hereby appoints Purchaser its agent-in-fact for the sole purpose of allowing Purchaser to continue to operate under each of the Contracts after the Closing until such time as Purchaser either designates such Contract as an Assigned Contract, or designates that it does not want to have such Contract assigned to it; provided, however, during such period, Purchaser shall be responsible for all obligations arising from or in connection with such Contract during such period. Any Contract or Permit and License which either (x) is affirmatively designated as excluded or (y) is not designated in a written notice from Purchaser to Sellers as an Assigned Contract by the end of the Executory Contract Option Period (each such Contract or Permit and License, an "Excluded Contract", and all such Contracts and Permits and Licenses collectively, the "Excluded Contracts"), shall not be an Assigned Contract or a Permit and License to be assigned to the Purchaser hereunder. There shall be no adjustment to the Purchase Price as a result of the Purchaser's election to exclude any one or more of the Contracts or Permits and Licenses from the Transactions pursuant to this Section 5.1(a) except that the Purchaser shall not be required to make any payments for Determined Cure Costs or any other amounts for any such Excluded Contracts. If a Contract is not designated an Excluded Contract prior to Closing, then any liabilities (other than those related to Determined Cure Costs or to Sellers' default under such Contract) that accrue under such Contract between the Closing and the earlier of (i) the date an election to designate such Contract as an Assigned Contract or an Excluded Contract is made and (ii) the end of the Executory Contract Option Period, shall be the responsibility of the Purchaser. Notwithstanding any provision herein to the contrary, all agreements by and among the Sellers or any Affiliates thereof with respect to the sharing of Taxes or allocation of Tax liability shall be treated as and shall constitute Excluded Contracts.

(b)     As soon as practicable after designation by Purchaser of a Contract as an Assigned Contract, Seller shall obtain the approval of the Bankruptcy Court pursuant to the Sale Order or such other Order of the Bankruptcy Court and/or the consent of the applicable counterparties to the extent necessary to effect the assignment in any case, the Sellers shall assume (to the extent required) and then assign to the Purchaser and the Purchaser shall assume from the Sellers, to the extent provided in Section 2.2(a), all the Assigned Contracts. To the extent that (x) any Assigned Contracts require the consent of a third party for the assignment (and are not fully assigned by the Sale Order) and (y) a consent to assignment from such third party has not been obtained prior to the Closing Date pursuant to Section 2.8(i) (either due to the Purchaser designating such as an Assigned Contracts following the required date set forth in Section 2.8(i) or due to Purchaser expressly waiving the condition to Closing that a particular consent be obtained before the Closing), then Sellers shall use all reasonable efforts to assist Purchaser in obtaining such third party consents following the Closing Date.

(c)     Subject to the terms of Sections 2.4 and 5.1(a), the Purchaser shall make provision for the payment of the Determined Cure Costs. The Sellers shall use their reasonable best efforts, including the filing and prosecution of any and all appropriate proceedings in the Bankruptcy Court, to establish the Determined Cure Costs, if any, for each Assigned Contract, in accordance with the Sellers' books and records as of the Petition Date.

(d)     The Sellers shall make available to the Purchaser true and complete copies of the Contracts and Permits and Licenses, or in the case of oral Contracts true and complete written descriptions thereof (in each case including all amendments thereto and assignments thereof) on or before the tenth (10th) Business Day after the date hereof. Notwithstanding any provision in this Agreement to the contrary, the Purchaser shall not be required to purchase, acquire or assume any Contract or Permit and License (or any Liabilities thereunder). Notwithstanding any provision in this Agreement to the contrary, during the Executory Contract Option Period, the Sellers will not reject or take any action or cause any of their Affiliates to reject or take any action (or fail to take any action that would result in rejection by operation of law) to reject, repudiate or disclaim any Contract without the prior written consent of the Purchaser.

Section 5.2     Conduct of Business Prior to the Closing.

(a)     The Sellers covenant and agree that, except as described in Section 5.2(a) of the Sellers' Disclosure Schedule, between the date hereof and the Closing and except as a result of the Chapter 11 Cases, each Seller shall, and shall cause each of its controlled Affiliates (as relates to the Business) to:

(i)     conduct its business in the ordinary course, consistent with past practice and in accordance with the Budget, and maintain its business in the condition as of the date hereof;

(ii)     use its commercially reasonable efforts and take all necessary actions to maintain, preserve and keep the Purchased Assets in good condition and repair (normal wear and tear excepted), and to maintain in effect all material licenses, permits, and approvals of Governmental Authorities which are necessary for the conduct of the Business;

(iii)     use commercially reasonable efforts to maintain the Sellers' current insurance coverage under each insurance policy maintained by the Sellers with respect to the Business, provided that the Purchaser acknowledges that, after the Closing Date, the Sellers shall have no responsibility for obtaining or maintaining any insurance relating to the Business, whether relating to or arising out of

occurrences prior to, at or subsequent to, the Closing, except to the extent required to enable the Sellers to comply with Section 2.1(a)(xiii);

(iv)    use commercially reasonable efforts to maintain in full force and effect the Owned Intellectual Property;

(v)    use commercially reasonable efforts to maintain in all material respects the goodwill and organization of the Business and Sellers' relationship with the Business Employees, suppliers, customers, landlords, lenders, lessors and others having business dealings with them in connection with the Business;

(vi)    subject to Section 5.1(c), use commercially reasonable efforts to obtain all necessary consents to the transfer of the Contracts that are to be transferred to the Purchaser pursuant to this Agreement, provided that, subject to Section 5.1(c), the obligation to use commercially reasonable efforts shall not require any payment of money or other consideration by the Sellers unless the Purchaser requests that the Sellers make such a payment and agrees to reimburse the Sellers for such payment;

(vii)    use commercially reasonable efforts to obtain authorization pursuant to the Sale Order to execute, deliver and/or file Uniform Commercial Code, lien releases, discharges, financing change statements and such other documents, notices or instruments as the Purchaser may reasonably deem necessary or desirable to release all Liens, except for Permitted Encumbrances, against the Purchased Assets;

(viii)    pay and discharge their Liabilities relating to the Business as they come due in the ordinary course of business, timely and duly file all Tax Returns of the Sellers with respect to the Business and pay all Taxes shown on such Tax Returns with respect to the operation of the Business (including all employment-type Taxes), except in each case those subject to the automatic stay under the Bankruptcy Code;

(ix)    use commercially reasonable efforts to consult in good faith on a weekly basis with the representatives of the Purchaser to report material operational developments and the general status of ongoing operations of the Business, including any Material Adverse Effect; and

(x)    if requested by Purchaser, cause the Canadian Entity to transfer all of its assets or any particular assets, free and clear of Liens, to one or more of the Sellers prior to Closing.

(b)    The Sellers covenant and agree that, except as described in Section 5.2(b) of the Sellers' Disclosure Schedule [**CERTAIN CARVE-OUTS FOR SCHEDULE BEING DISCUSSED**], between the date hereof and the Closing, and except as required by applicable Law or as a result of the Chapter 11 Cases, each Seller shall not, without the prior written consent of the Purchaser, and shall cause each of their Affiliates and the Sellers' and Affiliates' respective officers, directors, shareholders, members, employees, managers, partners, representatives and agents not to:

(i)    sell, lease, dispose or otherwise transfer or distribute any of the Purchased Assets, or any interest therein, other than transfers and dispositions, including the sale and purchase of Inventory from suppliers, made in the ordinary course of business;

(ii)    grant or announce any increase in the salaries, bonuses, severance or other benefits payable to any of the Business Employees or grant any equity or equity-based compensation to any Business Employees;

(iii)     hire any new employees or transfer employees from any other operations of the Sellers, or enter into any employment Contract or other arrangement with any Business Employees, except as may be required to replace any Business Employees who terminate voluntarily, without providing the Purchaser with reasonable notice of the same and a reasonable opportunity to consult with the Sellers;

(iv)     effect any involuntary termination of any Business Employees without providing the Purchaser with reasonable notice of the same and a reasonable opportunity to consult with the Sellers, except for involuntary terminations affected for cause or for violation of a Seller's employment policies;

(v)     adopt any employee benefit plan that would be an Employee Plan if in existence as of the date of this Agreement for any Business Employees, or amend or modify any existing Employee Plans for such employees;

(vi)     change any method of accounting or accounting practice or policy used by the Sellers (or by the Parent in a consolidated return with Sellers), other than such changes required by GAAP or applicable Tax Law;

(vii)     fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire;

(viii)     enter or agree to enter into any Material Contract which may be included in the Purchased Assets, other than in the ordinary course of business, or make or agree to make a material change or modification to any existing Material Contract included in the Purchased Assets, except for agreements relating to sale and purchase of Inventory from suppliers in the ordinary course of business;

(ix)     take or omit to take any action that would result in a breach of any of the representations, warranties or covenants made by the Sellers in this Agreement or in any of the Ancillary Agreements;

(x)     take any action or omit to take any action which act or omission would reasonably be anticipated to have a Material Adverse Effect on the Business or the Purchased Assets;

(xi)     enter into any Contract regarding the license, sublicense, agreement or permission to use Intellectual Property, other than non-exclusive license agreements in the ordinary course of business;

(xii)     enter into any Contract for the sale of any of the Owned Real Property or the sublease of any of the Leased Real Property;

(xiii)     amend its certificate or articles of incorporation, bylaws or other organizational documents or take any other action if any such amendment or action would have an adverse effect on the ability of any Seller to consummate the Transactions or otherwise adversely affect the Business or the value, utility or transferability of the Purchased Assets;

(xiv)     purchase, redeem or agree to purchase or redeem any of its equity interests, options, warrants or rights to purchase equity interests or securities of any kind convertible or exchangeable for equity interests;

(xv)     acquire any entity or all or substantially all of the assets of any entity or make any other investment outside the ordinary course of business;

(xvi)   make any capital expenditures, the aggregate amount of which are in excess of [$100,000];

(xvii)   other than Trade Payables, create or incur any Indebtedness or other Liabilities (absolute or contingent) in excess of $50,000 in the aggregate;

(xviii)   make any loan, advance, guaranty or other extension of credit to any Person or enter into any commitment to make any loan, advance, guaranty or other extension or credit, other than in the ordinary course of business pursuant to existing credit facilities, or enter into any other transaction with any Affiliate of any Seller or any employee of any Seller or an Affiliate of a Seller;

(xix)   create or incur any Encumbrance or fail to take action to discharge any involuntary Encumbrance, against or in respect of any Purchased Assets, except for Permitted Encumbrances;

(xx)   institute, settle, or agree to settle any Claims, actions, or proceedings, in each case involving an expenditure in excess of $100,000 in the aggregate, or involving any contingent or non-monetary obligation having value in excess of $100,000 in the aggregate, before any court or other Governmental Authority;

(xxi)   compromise or otherwise settle any Claims relating to, or adjust any assertion or Claim of a deficiency in, Taxes (or interest thereon or penalties in connection therewith), or file any appeal from an asserted deficiency, except in a form previously approved by the Purchaser in writing, or file or amend any Tax Return, in any case before furnishing a copy to the Purchaser and affording the Purchaser an opportunity to consult with respect thereto;

(xxii)   make any Tax election;

(xxiii)   declare, issue, make or pay any dividend or other distribution of assets, whether consisting of money, other personal property, real property or other thing of value, to holders of its equity interests;

(xxiv)   enter into any transaction with any Affiliate, director, officer, manager or employee of any Seller or Parent; or

(xxv)   agree to take any of the actions specified in this <u>Section 5.2</u>, except as expressly contemplated by this Agreement and the Ancillary Agreements.

Section 5.3      Access to Information.

(a)   From the date hereof until the expiration of the Executory Contract Option Period, upon reasonable notice, the Sellers shall, and shall cause their respective officers, directors, managers, employees, agents, representatives, accountants and counsel to: (a) afford the Purchaser, its Affiliates, potential financing sources and their respective authorized representatives reasonable access to the offices, properties and books and records of the Sellers (to the extent relating to the Business, the Purchased Assets or the Assumed Liabilities), including access to conduct environmental site assessments, if applicable; and (b) furnish to the respective officers, employees, and authorized agents and representatives of the Purchaser and its Affiliates and potential financing sources such additional financial and operating data and other information regarding the Business, the Purchased Assets and the Assumed Liabilities (or copies thereof) as the Purchaser may from time to time reasonably request; provided, however, that any such access or furnishing of information shall be conducted during normal business hours, under the supervision of the applicable Seller's personnel and in such a manner as not to

interfere with the normal operations of the Business; provided, further, that such review by and any information furnished to the Purchaser shall not affect the representations and warranties made by the Sellers in this Agreement or the remedies of the Purchaser for breaches of those representations and warranties. From time to time prior to the Closing, the Sellers shall promptly supplement or amend information previously delivered to the Purchaser with respect to any matter hereafter arising which, if existing or occurring prior to or at the date of this Agreement, would have been required to be set forth or disclosed herein; provided, however, that such supplemental information shall not be deemed to be an amendment to the Sellers' Disclosure Schedule or the representations and warranties made by the Sellers in this Agreement.

Section 5.4   Damage or Destruction.

Until the Closing, the Purchased Assets shall remain at the risk of the Sellers. In the event of any material damage to or destruction of any Purchased Asset (other than normal wear and tear) after the date hereof and prior to the Closing (in any such case, a "Loss"), the Sellers shall give notice thereof to the Purchaser, and if any such Losses would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, Purchaser shall be entitled to terminate this Agreement upon providing Sellers written notice of such termination. If any such Loss is covered by policies of insurance, all right and claim of the Sellers to any proceeds of insurance for such Loss shall be assigned and (if previously received by the Sellers and not used prior to the Closing Date to repair any damage or destruction) paid to the Purchaser at Closing. If any such Loss is not covered by policies of insurance, the Purchaser shall have the right to reduce the Purchase Price by an amount equal to (i) the estimated cost to repair or restore the Purchased Assets affected by such Loss (the "Affected Assets") to substantially repair or restore their condition immediately prior to the occurrence of such Loss or (ii) if such Affected Assets are destroyed or damaged beyond repair, the replacement cost of the Affected Assets, and all compensation payable on account of such Loss shall be retained by the Sellers. If the Purchaser elects to reduce the Purchase Price pursuant to this Section 5.4, the Sellers and the Purchaser shall negotiate in good faith in an effort to agree upon the amount of such reduction. If the parties are unable to reach agreement within five (5) Business Days after notice of the Loss is given by the Sellers, then the amount of the reduction shall be determined by an independent, qualified insurance adjuster selected by the parties (or, if they are unable to agree on such selection, one appointed by the Bankruptcy Court upon application of either party).

Section 5.5   Regulatory and Other Authorizations; Notices and Consents.

The Purchaser and the Sellers shall each use their commercially reasonable efforts to promptly obtain all waivers, authorizations, notices to proceed, consents, orders and approvals of all Governmental Authorities, officials and other Persons, make all required filings, applications and petitions with, and give all required notices to, the applicable Governmental Authorities and other Persons that may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement and the Ancillary Agreements and will cooperate fully with the other parties in promptly seeking to obtain all such waivers, authorizations, consents, orders, notices to proceed and approvals.

Section 5.6   Permits and Licenses.

Commencing on the date of this Agreement, the parties, cooperating in good faith, shall use commercially reasonable efforts to take such steps, including the filing of any required applications with Governmental Authorities, as may be necessary (i) to effect the transfer of the Permits and Licenses to the Purchaser on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable Law, and (ii) to enable the Purchaser to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and

authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of the Business from and after the Closing Date

Section 5.7  <u>Environmental Related Actions</u>.

Sellers shall, at their own cost and expense, be responsible for complying with the notice and transfer requirements of any Environmental Laws regarding the sale or transfer of the Owned Real Property and the Leased Real Property in compliance with, and within the time required under, Environmental Laws. All of the Environmental Permits will be modified or transferred, as the case may be, by the Sellers in compliance with, and within the time required under, Environmental Laws.

Section 5.8  <u>Intellectual Property</u>.

(a) No later than ninety (90) days following the Closing, each Seller shall, and shall cause each of its Affiliates to, file amendments with the appropriate Governmental Authorities changing its corporate name, "doing business as" name, trade name, and any other similar corporate identifier to a corporate name that does not contain any of the Trademarks or any Trademarks similar thereto comprising the Transferred Intellectual Property.

(b) The Sellers shall assign to the Purchaser the Contracts concerning Licensed Intellectual Property, or otherwise shall obtain for the Purchaser and its Affiliates the right to use Licensed Intellectual Property, such that, beginning on the Closing Date, the Purchaser and its Affiliates will have valid and enforceable rights to use all Licensed Intellectual Property as it was used by or for the benefit of the Business (including all configurations and customizations thereof) prior to the Closing. Prior to the Closing Date, the Sellers shall obtain and pay for all third party consents necessary to assign such agreements or to obtain such rights.

(c) On or before the Closing Date, the Sellers shall deliver to the Purchaser all records and information in the Sellers' possession or under the Sellers' control concerning the Owned Intellectual Property, and all copies thereof, including, but not limited to, any license and settlement agreements, the documentation, source code and object code for all computer software, documentation concerning registrations and applications, prosecution histories, correspondence with Governmental Authorities, litigation files relating to infringements, disputes or demands, including opposition and cancellation proceedings, cease and desist and protest letters, and all documents concerning security interests, mortgages, liens and other encumbrances.

(d) The Sellers are the current owners of record of the Owned Intellectual Property listed in <u>Section 3.8(a)</u> of the Sellers' Disclosure Schedule, and where title is not in the name of the Sellers, the Sellers shall be responsible for all fees and costs associated with said transfer of ownership or recordation of transfer of ownership of the Owned Intellectual Property in order to identify Sellers as the owner. The Sellers will take or cause to be taken, all actions and to do, or cause to be done, all things necessary and proper to ensure that the transfer of ownership and the recordation of the transfer of ownership of the Owned Intellectual Property identified under <u>Section 3.8(a)</u> of the Sellers' Disclosure Schedule is satisfied, including making all recordations and filings and taking all steps as may be reasonably required to obtain such recordation.

Section 5.9  <u>Further Action</u>.

Each party hereto shall use its commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the Transactions, including

using its commercially reasonable efforts to defend any lawsuits or other legal proceedings, whether judicial or administrative, whether brought derivatively or on behalf of third parties (including any Governmental Authority), challenging this Agreement. Without limiting the generality of the foregoing, each of the Sellers shall use (or cause its Affiliates to use) its commercially reasonable efforts to cause its accountants, attorneys, advisors, employees and other representatives to cooperate with the Purchaser in order to consummate and make effective the Transactions. In case at any time after the Closing Date any further action is reasonably necessary or desirable to carry out the purposes of this Agreement, the Sellers and the Purchaser shall take all such necessary action.

Section 5.10    Tax Cooperation and Exchange of Information.

(a)    The parties hereto will provide the other parties with such cooperation and information as may be reasonably requested in filing any Tax Return, amended Tax Return or claim for refund, determining any liability for Taxes or a right to a refund of Taxes or participating in or conducting any audit or other proceeding in respect of Taxes relating to the Purchased Assets or the Business. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules and related work papers and documents relating to rulings or other determinations by taxing authorities. Each of the parties will make themselves (and their respective employees) available, on a mutually convenient basis, to provide explanations of any documents or information provided under this Section 5.10(a). Each of the parties will retain all Tax Returns, schedules and work papers and all material records or other documents in its possession (or in the possession of its Affiliates) relating to Tax matters relevant to the Purchased Assets or the Business for the taxable period first ending after the Closing and for all prior taxable periods (the "Tax Documents") until the later of (i) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions, or (ii) six (6) years following the due date (without extension) for such Tax Returns. After such time, before any of the parties shall dispose of any such documents in its possession (or in the possession of its Affiliates), the other party shall be given the opportunity, after 90 days' prior written notice, to remove and retain all or any part of such documents as such other party may select (at such other party's expense). In the event that a Seller is liquidated or otherwise ceases to be a going concern prior to the expiration of the period described in the second preceding sentence, such Seller shall offer the Purchaser the opportunity described in the preceding sentence (with 90 days' prior written notice or such shorter period of notice as may be practicable) to remove and retain Tax Documents and such Seller may then dispose of any such documents not removed by the Purchaser.

(b)    The Sellers shall not take any actions (including, but not limited to, filing any Tax Return or amended Tax Return, responding to any audit or inquiry by a taxing authority, or settling or compromising any controversy with a taxing authority) that could affect the Tax Liability of the Purchaser or any of its Affiliates without the prior written consent of the Purchaser, which consent shall not be unreasonably withheld or delayed, provided that this Section 5.10(b) shall not apply to income taxes or Tax Returns in respect thereof.

Section 5.11    Conveyance Taxes.

In the event that any Conveyance Taxes (as may be reduced or eliminated pursuant to Section 1146(b) of the Bankruptcy Code) are assessed on the transfer of the Purchased Assets to the Purchaser under this Agreement, the Purchaser shall pay or cause to be paid such Conveyance Taxes. The Sellers shall timely and duly complete and file all returns and other documents associated therewith at the direction of the Purchaser.

Section 5.12        Nondisclosure.

Neither the Purchaser nor any Seller shall disclose to the public or to any third party any material non-public information concerning or relating to the other parties hereto, other than with the express prior written consent of such other parties, except as may be required by applicable Law or to enforce the rights of such disclosing party under this Agreement, in which event the contents of any proposed disclosure shall be discussed with such other parties before release; provided, however, that notwithstanding anything to the contrary contained in this Agreement, any party hereto may disclose such information to (a) any of its directors, officers, employees, stockholders, members, Affiliates, agents and representatives who need to know such information for the sole purpose of evaluating the Transactions, or (b) any Governmental Authority where such disclosure is required under any applicable Law. For the avoidance of doubt, as of the Closing, the Purchased Assets and the Assumed Liabilities (and any material non-public information with respect thereto) shall be deemed the confidential information of the Purchaser, and the Sellers shall maintain the confidentiality thereof in accordance with the terms of this Section 5.12.

Section 5.13        Documents at Closing.

Subject to the terms hereof, each party hereto agrees to execute and deliver on the Closing Date those documents identified in Sections 2.8 and 2.9 to which it is a party.

Section 5.14        Parties' Access to Records After Closing.

Each Seller acknowledges that all customer lists, records and other information pertaining to any Seller, the Business or its customers that are included in the Purchased Assets are proprietary, confidential information and that on and after the Closing, all such lists, records and information shall be the property of the Purchaser. Each of the parties hereto agrees to preserve until December 31, 2011, or the expiration of the applicable statute of limitations for documents necessary to prepare Tax returns, all records in its possession relating to any of the Purchased Assets, Assumed Liabilities or the Business for all time periods hereof ended on or prior to the Closing Date or relating to the Transactions. In the event that any party hereto needs and requests access to such records in the possession of any other party hereto relating to any of the Purchased Assets, the Assumed Liabilities or the Business or relating to the Transactions for the purpose of preparing income tax returns or for complying with any audit request, subpoena or other investigative demand by any Governmental Authority or for any civil litigation or any other legitimate purpose not injurious to such other party, such other party will allow such requesting party and its authorized representatives and agents reasonable access to such records during normal business hours at such other party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such requesting party to make extracts and copies thereof as may be necessary or convenient and, if required for such purpose, to have access to and copies of original documents (at such requesting party's expense).

Section 5.15        Notification of Certain Matters.

Except with respect to the actions required by this Agreement, Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to Sellers, of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would cause any of its representations or warranties in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date and (ii) any material failure of any Seller, on the one hand, or the Purchaser, on the other hand, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement; provided, however, the delivery of any notice pursuant to this Section 5.15 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement.

Section 5.16    Waiver and Release.

At any time and from time to time, prior to the date that is ninety (90) days after the Closing Date, Purchaser may designate for the release and waiver by Sellers any or all Avoidance Claims against (i) lenders to the Sellers, (ii) customers of the Sellers, (iii) vendors of Sellers relating to the Purchased Assets or the Business, (iv) suppliers of Sellers relating to the Purchased Assets or the Business and (v) Transferred Employees. The Sellers shall execute and deliver any requested documentation to evidence the foregoing within ten (10) days of Purchaser's request.

Section 5.17    Bankruptcy Court Matters.

(a)    Alternative Transaction. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of Qualified Bids (as defined in the Bid Procedures Order) in accordance with the Bid Procedures Order. From and after the date of the Auction (as defined in the Bid Procedures Order), Sellers will not, and will cause their respective representatives, agents and controlled Affiliates not to (i) discuss or negotiate with, initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than the bidder or bidders, as the case may be, who made the Successful Bid (as defined in the Bid Procedures Order) or Purchaser and their respective Affiliates, agents and representatives) with respect to any Alternative Transaction or (ii) provide any confidential information regarding any Seller or its business to any person or entity other than the bidder or bidders, as the case may be, who made the Successful Bid or Purchaser, except to the extent expressly permitted herein. Prior to the Auction Date, Sellers will promptly, and in any event within two Business Days, inform and provide a detailed summary to Purchaser of any proposal for an Alternative Transaction that it or any of its affiliates or representatives may receive. Nothing contained in this Section 5.17 will be construed to prohibit any Seller or its representatives from soliciting, considering, negotiating, agreeing to or otherwise taking action in furtherance of, any Alternative Transaction after the entry of the Bid Procedures Order, but only so long as such actions are taken in accordance with the Bid Procedures Order and the Restructuring Agreement Sellers will comply with the Bid Procedures Order in all respects.

(b)    Commencement of Cases: Bid Procedures and Auction. On the Petition Date, Sellers will commence the Chapter 11 Cases by filing petitions for relief under the Bankruptcy Code with the Bankruptcy Court. No later than the second Business Day following the Petition Date, Sellers will file with the Bankruptcy Court this Agreement and a motion seeking the entry of the Bid Procedures order. Sellers will use their reasonable efforts, and Purchaser will reasonably cooperate with Sellers, to obtain the entry of the Bid Procedures Order no later than 30 days following the Petition Date. Sellers will use their reasonable efforts, and Purchaser will reasonably cooperate with Sellers, to ensure that the Bankruptcy Court hearing for the Sale Order is commenced promptly after the Auction (as defined in the Bid Procedures Order) and the Sale Order is entered by the Bankruptcy Court as soon as possible following the Auction Date, but in no event later than 5:00 p.m. Local Time on the date that is 52 days following the Petition Date. After the Auction, Sellers will use their reasonable efforts to cause the Closing to occur on or before the date 80 days after the Petition Date.

(c)    Sale Order. Purchaser agrees that it will promptly take such commercially reasonable actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order is appealed, Sellers and Purchaser will use their respective reasonable efforts to defend such appeal.

**ARTICLE VI**

**EMPLOYEE MATTERS**

Section 6.1        Transferred Employees

(a)        Upon notice to the Sellers and at mutually agreeable times, the Sellers will permit the Purchaser's representatives to meet with Business Employees prior to the Closing Date. The Purchaser may, at its option, extend offers of employment to all or any of the Business Employees effective as of the Closing Date (those employees who are offered and accept employment by the Closing Date shall be known as "Transferred Employees"), it being understood that the Purchaser shall have no obligation to employ any of the employees of the Sellers. From and after the execution of this Agreement, the Sellers shall use their best efforts to assist the Purchaser in retaining those employees that are employed primarily in connection with the Business which the Purchaser wishes to hire and the Sellers will not take any action to preclude or discourage any of the Sellers' employees from accepting any offer of employment extended by the Purchaser.

(b)        The Sellers shall retain responsibility for and continue to pay all medical, life insurance, disability and other welfare plan expenses and benefits for each Transferred Employee with respect to claims incurred by such Transferred Employees or their covered dependents on or prior to the Closing Date. Expenses and benefits with respect to claims incurred by Transferred Employees or their covered dependents after the Closing Date shall be the responsibility of the Purchaser, to the extent such expenses and benefits are payable under a plan or insurance contract sponsored or maintained by the Purchaser. For purposes of this paragraph, a claim is deemed incurred when the services that are the subject of the claim are performed; in the case of life insurance, when the death occurs, in the case of long-term disability benefits, when the disability occurs and, in the case of a hospital stay, when the employee first enters the hospital.

(c)        Purchaser and Sellers hereby acknowledge that for purposes of IRS Revenue Procedure 2004-53, Purchaser qualifies as a successor employer with respect to any Transferred Employees. In connection with the foregoing, (i) the parties agree to follow the "Alternative Procedures" set forth in Section 5 of IRS Revenue Procedure 2004-53, and (ii) Purchaser shall assume each Seller's obligation to furnish an IRS Form W-2, Wage and Tax Statement, to each Transferred Employee with respect to the calendar year in which the Closing Date occurs.

Section 6.2        No Obligation

Except as otherwise expressly provided in this Agreement, nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of any Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

## ARTICLE VII

## CONDITIONS TO CLOSING

Section 7.1      Conditions to Obligations of the Sellers.

The obligations of the Sellers to consummate the Transactions shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (but only in writing) by the Sellers (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a)      Representations, Warranties and Covenants. (i) All of the representations and warranties made by the Purchaser in this Agreement and in the Ancillary Agreements to which it is a party shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); (ii) the Purchaser shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by the Purchaser on or prior to the Closing Date; and (iii) with respect to clauses (i) and (ii), at the Closing there shall be delivered to the Sellers a certificate signed by a duly authorized representative of the Purchaser to the foregoing effect.

(b)      Governmental Approvals. All authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Authority which are necessary to consummate the Transactions shall have been filed, been obtained or occurred and such authorizations, consents, orders or approvals shall not have expired or been withdrawn.

(c)      No Order. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that has the effect of making the Transactions illegal or otherwise restraining, prohibiting or materially restricting the consummation of such Transactions.

(d)      Sale Order. The Bankruptcy Court shall have entered the Sale Order that is acceptable in form and substance to the Purchaser.

(e)      Closing Deliveries. Sellers shall have received all of the deliverables of the Purchaser as set forth in Section 2.9.

Section 7.2      Conditions to Obligations of the Purchaser.

The obligations of the Purchaser to consummate the Transactions shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (but only in writing) by the Purchaser (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a)      Representations, Warranties and Covenants. (i) All of the representations and warranties made by the Sellers in this Agreement and in the Ancillary Agreements shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); (ii) each Seller shall have performed and complied in all material respects with all agreements

and covenants required by this Agreement to be performed by such Seller on or prior to the Closing Date; and (iii) with respect to clauses (i) and (ii), at the Closing there shall be delivered to the Purchaser a certificate signed by a duly authorized representative of each Seller to the foregoing effect.

(b)　　Governmental Approvals. All authorizations, consents, orders or approvals of, or declarations or filings with any Governmental Authority which are necessary to consummate the Transactions shall have been filed, been obtained or occurred and such authorizations, consents, orders or approvals shall not have expired or been withdrawn.

(c)　　No Adverse Order. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that has the effect of making the Transactions illegal or otherwise restraining, prohibiting or materially restricting the consummation of such Transactions.

(d)　　Procedures Order/Sale Order. Not later than January 13, 2010, the Bankruptcy Court shall have approved an order approving the sales procedures set forth on Exhibit F ("Bid Procedures Order") in substantially the form of Exhibit F, with any changes that are reasonably acceptable to Purchaser, and such Bid Procedures Order shall be a Final Order. Not later than February 4, 2010, the Bankruptcy Court shall have entered the Sale Order that is acceptable in form and substance to the Purchaser and, unless waived in writing by Purchaser, such Sale Order shall be a Final Order.

(e)　　No Material Adverse Effect. Since the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(f)　　Closing Deliveries. The Purchaser shall have received all of the deliverables of the Sellers as set forth in Section 2.8.

(g)　　Contracts. The Sellers shall have obtained, to the extent necessary to effect the assignment of the Contracts set forth in Section 7.2(g) of the Sellers' Disclosure Schedule and the assignment of the Intellectual Property pursuant to Sections 5.8(b) and 5.8(c), the approval of the Bankruptcy Court pursuant to the Sale Order and/or the consent to the assignment from the applicable counterparties, and the Sellers shall have duly assigned such Contracts and Intellectual Property to the Purchaser and such Contracts and Intellectual Property shall be in full force and effect.

(h)　　Permits and Licenses. All Permits and Licenses included in the Purchased Assets shall have been transferred to the Purchaser as legal and beneficial holder thereof, or, if any Permit or License is not transferable, a replacement Permit or License, on substantially similar terms, shall have been issued to the Purchaser.

(i)　　Release of Liens. To the extent that the Sale Order authorizes the Sellers to file, execute, deliver and/or file Uniform Commercial Code termination statements, lien releases, discharges, financing change statements and such other documents, notices or instruments absent the consent of the holder of a Lien, the Sellers shall have executed, delivered and (if requested by Purchaser) filed such termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as the Purchaser may reasonably deem necessary or desirable to release Liens (other than Permitted Encumbrances) on the Purchased Assets, to the extent they are authorized to do so absent the consent of the holder of the Lien.

(j)　　New Senior Credit Facility. On or prior to the Closing, the Purchaser shall have entered into a senior secured first lien revolving credit facility (the "New Senior Credit Facility"), with one or more third party lenders, with an aggregate maximum commitment of $5,000,000 and otherwise pursuant to terms and conditions that are acceptable to Purchaser.

(k)    Absence of Investigations and Proceedings.  There shall be no Order or Action before or by any Governmental Authority and no formal investigation by any Governmental Authority pending or promulgated, or to the Sellers' Knowledge, threatened, to which the Purchaser or any Seller is or may be a party that could reasonably be expected to adversely affect, in any material respect, the Business or the Purchased Assets or with the object of challenging or preventing the consummation of the Transactions.

(l)    Funding Agreement Termination.  The Purchaser and Aurora shall have become satisfied that (x) no Secured Obligations (as defined in the Fund Security Agreement) remain in existence under that certain Fund Security Agreement dated as of May 22, 2008, by and between Aurora and UBS AG, Stamford Branch, as Collateral Agent (the "Fund Security Agreement"), pursuant to which Aurora pledged and granted to the Collateral Agent, for the benefit of the Existing Senior Term Lenders and certain other parties, a lien on and security interest in all of Aurora's right, title and interest in the Fund Collateral Account (as such term is defined in the Fund Security Agreement) and (y) the Fund Security Agreement has been terminated and is of no further force or effect.

## ARTICLE VIII

## TERMINATION, AMENDMENT AND WAIVER

Section 8.1    Termination.

This Agreement may be terminated at any time prior to the Closing:

(a)    by either Sellers, on the one hand, or the Purchaser, on the other hand, if the Closing shall not have occurred by the Termination Date; provided, however, that the right to terminate this Agreement under this Section 8.1(a) shall not be available to any party whose failure (or in the case of a Seller as the determining party, any Seller's failure) to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date;

(b)    by either the Purchaser or the Sellers in the event that any Order restraining, enjoining or otherwise prohibiting the Transactions shall have become a Final Order;

(c)    without limitation of Section 8.1(e) below, by the Purchaser by written notice to the Sellers (i) if any event occurs or condition exists which would render impossible the satisfaction of one or more conditions to the obligations of the Purchaser to consummate the Transactions as set forth in Section 7.2, or (ii) in accordance with Section 5.4;

(d)    by the Purchaser by written notice to the Sellers if either (i) the Bid Procedures Order has not been entered by [**January 13**], 2010, (ii) the auction covering the sale of the Purchased Assets in the Bankruptcy Court has not occurred by _____, 2010, or (iii) the Sale Order has not been entered by the Bankruptcy Court on or before [**February 4**], 2010.

(e)    by the Purchaser by written notice to the Sellers upon any event that causes the termination of the Restructuring Agreement pursuant to the terms thereof;

(f)    by the Sellers by written notice to the Purchaser if any event occurs or condition exists which would render impossible the satisfaction of one or more conditions to the obligations of the Sellers to consummate the transactions contemplated by this Agreement as set forth in Section 7.1;

(g)    by the Purchaser if there has occurred a material misrepresentation or other material breach by any Seller of its representations, warranties or covenants set forth herein or in any Ancillary Agreement; provided, however, that if such breach is susceptible to cure, the breaching party or parties shall have twenty (20) calendar days after receipt of written notice (which notice includes a summary description of such breach) from the Purchaser of its intention to terminate this Agreement if such breach continues in which to cure such breach;

(h)    by the Sellers if there has occurred a material misrepresentation or other material breach by the Purchaser of its representations, warranties or covenants set forth herein or in any Ancillary Agreement to which the Purchaser is a party; provided, however, that if such breach is susceptible to cure, the Purchaser shall have twenty (20) calendar days after receipt of written notice (which notice includes a summary description of such breach) from the Sellers of its intention to terminate this Agreement if such breach continues in which to cure such breach;

(i)    by Purchaser if (i) the Sellers designate an Alternative Transaction as the Successful Bid at the conclusion of the Auction, (ii) Sellers enter into an agreement with respect to an Alternative Transaction, (iii) an Alternative Transaction is consummated, or (iv) any Seller files a plan contemplating an Alternative Transaction; or

(j)    by the written consent of each of the Sellers and the Purchaser.

Section 8.2    Effect of Termination.

In the event that this Agreement is terminated pursuant to Section 8.1, all further obligations of the parties under this Agreement shall terminate; provided that the obligations of the parties contained in Sections 5.12, Sections 10.1 through 10.15 and this Section 8.2 shall survive any such termination.

## ARTICLE IX

## GENERAL PROVISIONS

Section 9.1    Break-up Fee; Expense Reimbursement.

(a)    If Purchaser terminates this Agreement pursuant to Section 8.1(e), Section 8.1(g) or Section 8.1(i), then Sellers shall pay to Purchaser, within two Business Days after such termination, a break-up fee equal to $500,000 (the "Break-Up Fee") in cash, in addition to the reimbursement of Purchaser's reasonable, actual out-of-pocket fees and expenses, including reasonable attorneys' fees and expenses of other consultants, incurred in connection with the transaction contemplated by this Agreement, including the reasonable fees and expenses of the agent and the proposed lenders under the New Senior Credit Facility (the "Expense Reimbursement"), provided that if this Agreement is terminated pursuant to Section 8.1(e) due to the exercise by the board of directors of any of the Sellers of their fiduciary duties in accepting any other offer or taking any action in contravention of this Agreement, as contemplated by Section 3(d) of the Restructuring Agreement, then (x) the Expense Reimbursement shall be due and payable within two (2) Business Days after such termination and (y) the Break-up Fee shall only become due and payable upon the consummation of an Alternative Transaction.

(b)    Sellers' obligation to pay the applicable Break-Up Fee and/or the expense reimbursement to the Purchaser pursuant to this Section 9.1 shall survive the termination of this Agreement pursuant to Section 8.1 and shall constitute a superpriority administrative expense of the Sellers under Section 507(b) of the Bankruptcy Code.

(c)     The applicable Break-Up Fee and/or expense reimbursement to the Purchaser payable under the circumstances provided in this <u>Section 9.1</u> constitutes liquidated damages and not a penalty and is the exclusive remedy of Purchaser and its Affiliates for any termination of this Agreement pursuant to <u>Section 8.1</u>. Purchaser shall not, and shall cause each of its controlled Affiliates not to, bring any cause of action against or otherwise seek remedies from any Seller or any of their Affiliates or any counterparty to an Alternative Transaction or any of such counterparty's Affiliates (other than for payment of the applicable Break-Up Fee and/or the required expense reimbursement when payable hereunder), whether at equity or in law, for breach of contract, in tort or otherwise, in the event that this Agreement is terminated pursuant to <u>Section 8.1(e)</u>, <u>Section 8.1(g)</u> or <u>Section 8.1(i)</u>, and any such claim, right or cause of action by Purchaser or any other Person against Sellers or its Affiliates (other than for such payment of the Break-Up Fee and/or the required expense reimbursement) is hereby fully waived, released and forever discharged.

Section 9.2     <u>Expenses</u>.

Except as set forth in <u>Section 9.1</u> above or as otherwise specified in this Agreement or in the Restructuring Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred. As between the Purchaser and the Sellers, the Sellers shall bear all of the costs of administration of the Chapter 11 Cases.

Section 9.3     <u>Notices</u>.

All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for any party as shall be specified by such party in a notice given in accordance with this <u>Section 9.3</u>):

(i)     if to the Sellers:

Ames Holding Corp.

_____
_____
Facsimile:  _____
Attention:  _____

with a copy to:

_____
_____
_____
Facsimile:  _____
Attention:  _____

(ii)     if to the Purchaser:

Axia Acquisition Corporation

_____
_____
_____
Facsimile: _____
Attention: _____

with a copy to:

Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
Facsimile: (312) 863-7474
Attention: Randall L. Klein, Esq.

Section 9.4    Public Announcements.

Neither the Purchaser, on the one hand, nor any of the Sellers, on the other hand, shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the Transactions, or otherwise communicate with any news media without the prior written consent of the Sellers or the Purchaser, respectively, except as otherwise required by Law, applicable stock exchange regulation or in filings in the Bankruptcy Court or office of the United States trustee, and the parties to this Agreement shall cooperate as to the timing and contents of any such press release, public announcement or communication.

Section 9.5    Severability.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 9.6    Entire Agreement.

This Agreement (including the Exhibits hereto) and the Ancillary Agreements constitute the entire agreement of the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, among the Sellers and the Purchaser with respect to the subject matter hereof and thereof.

Section 9.7    Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors (including any trustee, receiver, receiver-manager, or similar officer appointed in respect of the Sellers in the Chapter 11 Cases) and permitted assigns, but shall not be assignable or delegable by the Sellers without the prior written consent of the Purchaser and by Order of the Bankruptcy Court. The Purchaser may assign this Agreement or any of its rights or obligations hereunder without the consent of the Sellers and the Purchaser shall have no further liability in respect of the rights

or obligations so assigned; provided that such assignee shall assume all such rights or obligations of the Purchaser hereunder. Sellers agree to enter into such amendments to, or restatements of, this Agreement and the exhibits hereto as may be reasonably required to give effect to this <u>Section 9.7</u>, so long as such amendments or restatements do not adversely affect the rights of Sellers hereunder or thereunder.

Section 9.8    <u>Amendment</u>.

This Agreement may not be amended or modified except (a) (i) by an instrument in writing signed by, or on behalf of, the Sellers and the Purchaser or (ii) by a waiver in accordance with <u>Section 9.9</u>; and, (b) to the extent such amendment or modification is material, by an Order of the Bankruptcy Court.

Section 9.9    <u>Waiver</u>.

Any Seller, on the one hand, or the Purchaser, on the other hand, may: (a) extend the time for the performance of any of the obligations or other acts of the other; (b) waive any inaccuracies in the representations and warranties of the other contained herein or in any document delivered by the other pursuant hereto; or (c) waive compliance with any of the agreements or obligations of the other contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

Section 9.10    <u>No Third Party Beneficiaries</u>.

This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

Section 9.11    <u>Governing Law</u>.

This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York and, to the extent applicable, the Bankruptcy Code. The parties hereto agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Agreement or the Transactions and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party: (a) agrees that all such actions or proceedings shall be heard and determined in a federal court sitting in New York; (b) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by <u>Section 9.3</u> to such party at its address as provided in <u>Section 9.3</u> (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Law).

Section 9.12      <u>Waiver of Jury Trial</u>.

EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.12</u>.

Section 9.13      <u>Currency</u>.

Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

Section 9.14      <u>Construction</u>.

The parties hereto and their respective legal counsel participated in the preparation of this Agreement, and therefore, this Agreement shall be construed neither against nor in favor of any of the parties hereto, but rather in accordance with the fair meaning thereof.

Section 9.15      <u>Counterparts</u>.

This Agreement may be executed and delivered (including by facsimile transmission or in pdf format) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. A signature page delivered by facsimile or pdf format shall be deemed the same, and equally enforceable, as an original.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

AMES HOLDING CORP.

By: _____
Name: _____
Title: _____

AXIA INCORPORATED

By: _____
Name: _____
Title: _____

AMES TAPING TOOL SYSTEMS, INC.

By: _____
Name: _____
Title: _____

TAPETECH TOOL CO., INC.

By: _____
Name: _____
Title: _____

AXIA ACQUISITION CORPORATION

By: _____
Name: _____
Title: _____