IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Jointly Administered |
| AMES HOLDING CORP., *et al.*,[1] | ) | Case No. 09-14406 (CSS) |
| | ) | |
| Debtors. | ) | Re: D.I. No. 42 |
| | | Obj. Deadline: 1/5/10 at 4:00 p.m. |

## PRELIMINARY OBJECTION OF ILLINOIS TOOL WORKS INC. TO DEBTORS' MOTION FOR (A) ORDER APPROVING BIDDING PROCEDURES AND CERTAIN BID PROTECTIONS, SCHEDULING A SALE HEARING AND APPROVING THE FORM OF NOTICE OF AUCTION AND SALE HEARING AND (B) ORDER AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AT THE CONCLUSION OF SUCH AUCTION, THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND THE REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

NOW COMES Illinois Tool Works Inc. ("ITW"), a prospective purchaser of the Debtors' assets, and files this preliminary objection (the "Objection")[2] to the Debtors' Motion for (A) Order Approving Bidding Procedures and Certain Bid Protections, Scheduling a Sale Hearing and Approving the Form of Notice of Auction and Sale Hearing and (B) Order Authorizing the Sale of Substantially All of the Debtors' Assets at the Conclusion of Such Auction, the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and the Rejection of Certain Executory Contracts and Unexpired Leases (the "Sale Motion")[3], and respectfully states as follows:

---

[1] The Debtors in these cases are Ames Holding Corp., Axia Incorporated. TapeTech Tool Co., Inc.. and Ames Taping Tool Systems, Inc.

[2] ITW reserves the right to file additional objections after it has an adequate opportunity to investigate the purported basis for the Sale Motion and the merits of the proposed sale.

[3] Any capitalized terms not defined herein shall have the meaning ascribed to such terms in the Sale Motion.

## INTRODUCTION

1.     ITW is a NYSE listed Fortune 200 company with a market capitalization of more than $24 billion and revenue of more than $17.1 billion for its year ended 2008. ITW believes that the proposed sale is premature and that the bid procedures unfairly equate the face amount of the Stalking Horse Bidder's noncash *debt and equity* purchase price with all cash bids of prospective purchasers. The proposed Bidding Procedures accordingly shut prospective *cash* purchasers such as ITW out of the bidding process by requiring a minimum bid of nearly $22 million, when an all cash bid of less than $22 million may very well be more valuable to the Debtors' estate that the Stalking Horse Bid.

2.     Indeed, in stark contrast to the Bidding Procedures' requirements to submit a "Qualified Bid" in cash, the APA provides for a substantially all noncash deal primarily comprised of $18 million of term notes in favor of the Existing Senior Term Lenders and 21.5% of equity in the newly formed purchasing entity. The bidding process is accordingly unbalanced from the beginning and chill bidding by heavily favoring the Stalking Horse Bidder. Moreover, the Debtors have not provided any basis for this Court to conclude that the current cash "value" to the Debtors' estate of the stalking horse bid is actually $22 million such that any cash bidders must bid at least that amount or be excluded from the sale process. The Bidding Procedures should accordingly be modified to enable the possibility of competing qualified cash bids in an amount less than $22 million.

3.     Moreover, aside from the usual generalities debtors argue in favor of the need for an expedited sale process, the Debtors have not demonstrated that the specific proposed sale to new companies to be formed by existing shareholders and/or lenders (or for that matter any immediate sale of substantially all of the Debtors' assets) is warranted under such expedited time

constraints. ITW respectfully requests that the bid deadline and auction date be extended 30 days to enable a fair amount of time for due diligence and competitive bidding and that the projected closing date be moved to a date in the middle of March, which is roughly two weeks later than the current projected closing date of February 26, 2010. ITW accordingly objects to the procedural and substantive aspects of the proposed sale, as set forth below.

## OBJECTIONS TO PROPOSED BIDDING PROCEDURES

4.      ITW objects to the Debtors' proposed Bidding Procedures, which will not allow for competitive bidding and unduly favor the Stalking Horse Bidder, which is partially comprised of insiders and/or parties with inside information due to their relationship with the Debtors prior to the Petition Date.

5.      *The proposed Bidding Procedures impose strict requirements on potential bidders and unreasonably limit their opportunity to complete due diligence.* Only bids that include all of the Qualified Bid Required Documents will be eligible for consideration at the Auction. Under the Bidding Procedures, potential cash bidders are required to provide the Debtors with information about their financial qualifications including unspecified "recent financial information, reasonably satisfactory to the Debtors." *See* Sale Motion at ¶ 35. Furthermore, potential bidders that receive the bid procedures notice (if approved by this Court on January 12, 2010) would have to complete their due diligence within two weeks to submit their bids to the Debtors by the proposed January 27 deadline.

6.      *The proposed Bidding Procedures unnecessarily limit the prospective purchaser's ability to submit more valuable bids and the Debtors' ability to consider better offers.* Under the proposed Bidding Procedures, a "Qualified Bidder" *must* deliver Qualified Bid Documents. Qualified Bid Documents require, among other things, that only cash bids of at least

approximately $22 million will make a prospective purchaser a "Qualified Bidder" even though the Stalking Horse Bidder's bid is comprised primarily of debt and equity that has not been shown by the Debtors to be properly valued at $21,138,686. Indeed, the value assigned by the Debtors assume, without any support or evidence, that the $18,000,000 in new term notes are the equivalent of $18,000,000 in cash and assigns a value of $3,138,686 to the equity component of the Stalking Horse Bidder's offer. Furthermore, the Debtors allege that the Stalking Horse Bidder's noncash bid is better than the liquidation value but does not offer the Court any evidence of the liquidation value to conclude that cash bids of less than $22 million should not be considered qualified bids. All cash bidders at an amount less than $22 million should be allowed to submit a qualified bid and demonstrate to the court why its all cash bid is in the best interests of the Debtors, their creditors and their estates.

7.      *The proposed Break-Up Fee and Bid Protections are not justified.* The proposed Bidding Procedures contemplate a Break-Up Fee of $500,000, payable from the proceeds of sale upon consummation of a transaction with a competing bid. The proposed Bidding Procedures also contemplate overall bid protection for the Stalking Horse Purchaser, such that the first competing qualified bid that the Debtors may consider must be at least $750,000 (plus, some unknown and uncapped amount for expense reimbursements) more than the $21,138,686 stated (but unsupported) value of the Stalking Horse Bidder's offer. There is no reason to believe that the Proposed Purchaser's bid will foster competitive bidding. *See In re S.N.A. Nut Co.*, 186 B.R. 98, 105 (Bankr. N.D. Ill. 1995) ("absent compelling circumstances which clearly indicate that payment of the fee would be in the best interests of the estate, breakup fees should not be awarded in bankruptcy auction sales"). Moreover, there is no basis for the Stalking Horse Bidder, which is effectively submitting a noncash offer, to obtain such substantial bid

protections. especially in light of the Debtors' failure to properly market its assets to other prospective purchasers prior to the Petition Date. The Break-Up Fee and bid protections should accordingly be removed from the proposed Bidding Procedures. To the extent any break-up fee is allowed. it should be tied to the Stalking Horse Bidder's actual costs only, and the Stalking Horse Bidder should be required to make its due diligence materials available to potential bidders. Moreover, the Stalking Horse Bidder's bid protection for its actual costs should be subject to a cap of $100,000.

## GENERAL OBJECTION TO THE PROPOSED SALE

8.      ITW generally objects to the proposed sale process on the basis that it is premature and unfairly chills bidding because of the high qualified cash bid price for a noncash stalking horse bid and short due diligence period. The Debtors have not demonstrated that they have explored all sale and restructuring possibilities. The Sale Motion is long on conclusory allegations, but woefully short on facts that support the Debtors' purported business justification for the proposed sale. This simply appears to be a case in which the Debtors "unplugged the freezer" and filed a bankruptcy case immediately before the holidays to further shorten an already expedited sale process. The Sale Motion provides in conclusory fashion that:

> If their strategy for preserving the value of their assets is to succeed, the Debtors'
> believe that the proposed Sale must occur within an extremely short period of
> time. Key to the success of the Sale is the survival of the Debtors' supplier and
> customer base. as well as the preservation of ongoing consumer and employee
> goodwill and support. The Debtors' businesses cannot survive a prolonged period
> of uncertainty. Suppliers will turn to other outlets for their products, customers
> will look elsewhere for the products they have been purchasing from the Debtors.
> and key employees will leave for other opportunities. To preserve this going
> concern value and obtain the anticipated benefits of the proposed Sale, then. it is
> imperative that this process be completed expeditiously. Given the continuing
> stress of the Debtors' businesses. key relationships with the Debtors' customers
> and suppliers likely cannot be preserved if the sale process is not concluded
> quickly. Absent a prompt sale. the value of the Debtors' assets will rapidly
> decline. and the ability to achieve a going concern sale will be lost.

Sale Motion at ¶ 23.

9.      Notably, by the Debtors' own admission, they have seen the financial problems coming for quite some time and have pursued a number of initiatives for the past two years in an effort to reduce costs. Sale Motion at ¶ 15. The Debtors do not, however, specify precisely what efforts have been made to: (i) obtain long term funding to support an internal plan of reorganization; (ii) attract new investors; and (iii) identify strategic buyers. The Court must require the Debtors to demonstrate that they have explored all of these avenues before moving ahead with a sale process involving an inside deal with releases to parties with prepetition relationships with the Debtors.

10.     Instead of explaining their efforts to seek outside capital or purchasers, the Debtors explain that the Stalking Horse Bidder is a Delaware corporation newly formed for the purpose of acquiring the Debtors' assets, among other things, and is a wholly owned subsidiary of another newly formed corporation that is owned by one or more lenders and shareholders of Ames Holding. Sale Motion at ¶ 21. The Debtors further explain that at the time of the filing of the Sale Motion, their investment banker had not actually marketed the Debtors assets or distributed solicitation materials but was instead preparing materials describing the Debtors, their business and their assets and identifying persons who might have the interest and ability to bid on the Debtors' assets. Sale Motion at ¶ 26. The Debtors further explain that they had not yet created any data room for prospective purchasers to access pertinent information regarding the Debtors' assets and businesses. Sale Motion at ¶ 27.

11.     ITW is a prospective purchaser with the interest and ability to make a cash bid for the Debtors' assets. The Debtors, however, have unnecessarily placed prospective purchasers, the creditors and the Court "under the gun." ITW likely does not have sufficient time under the

current deadlines to complete its due diligence and submit a competing bid. The Sale Motion was filed on December 16, 2009, two days after the Petition Date, and contemplates the commencement of a sale process that runs through the December holidays and concludes in January auction but does not close until the end of February. Absent compelling evidence that the postponement of the proposed deadlines by 30 days and the closing of the sale by roughly two weeks will have a detrimental effect on the Debtors, the Court should give prospective cash purchasers, such as ITW, a reasonable opportunity to evaluate the proposed sale and submit competing cash bids that are not constrained by the unsupported value placed on the current non-cash offer of the Stalking Horse Bidder.

[The balance of this page has intentionally been left blank]

## CONCLUSION

12.     ITW requests that the Court require modification of the bidding procedures as set forth herein to give ITW (and other prospective purchasers) an adequate opportunity to participate in a fair and competitive bidding process.  Alternatively, the Court should deny the Sale Motion based on the objections set forth herein.

Dated:  January 5, 2010

**Smith Katzenstein & Furlow LLP**
By: /s/ Michael P. Migliore
Kathleen M. Miller (Id. No. 2898)
Michael P. Migliore (Id. No. 4331)
The Corporate Plaza
800 Delaware Avenue, 10th Floor
P.O. Box 410 (Courier 19801)
Wilmington, DE 19899
Tel. (302) 652-8400
Fax  (302) 652-8405
kmiller@skfdelaware.com
mpm@skfdelaware.com

-and-

**Shaw Gussis Fishman Glantz
 Wolfson & Towbin LLC**
Mark L. Radtke (#6275738)
321 North Clark Street, Suite 800
Chicago, Illinois 60654
Tel: (312) 541-0151

Counsel for Illinois Tool Works Inc.